IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-08-00413-CR

 

EMMITT DOUGLAS CARROLL,

                                                                                    Appellant

 v.

 

The State of Texas,

                                                                                    Appellee

 

 

 



From the 361st District
Court

Brazos County, Texas

Trial Court No.
07-05908-CRF-361 

 



MEMORANDUM  Opinion



 

A jury found Appellant Emmitt Douglas
Carroll guilty of the offense of aggravated robbery.  The trial court assessed
his punishment at fifty-eight years’ imprisonment.  In two issues, Carroll
appeals.  We will affirm.

BACKGROUND

On September 17, 2007, at about 2:00
a.m., Patricia Garcia took her husband to work and then returned to her
apartment complex in Bryan, Texas.  She parked her vehicle in the parking lot,
got out, and opened the back door of the vehicle to get her two-year-old
daughter out of the backseat.  At that time, she heard a rustling in the bushes,
someone say “go, go, go,” and then a gun cocking.  She then saw a man with a
silver gun coming out of the darkness toward her.  He was wearing a light-colored
shirt that looked like an undershirt, baggy blue jeans or blue jean shorts, white
tennis shoes, and a red bandana around his neck to cover his face.  Once the
man was standing in front of her, he said, “I don’t want to hear nothing.”  At
that point, Garcia’s daughter saw the man and said, “No.”  The man then “kind
of backed away a little.”  He asked Garcia for her purse.  Garcia pulled the
purse out from under the seat, and the man took it out of her hands.  He also
asked for her phone.  She replied that it was in the purse.  He looked inside
the purse and then started to leave.

By about 2:15 or 2:18 a.m., Garcia got
back inside of her apartment and sent a message to her husband on the
computer.  When she spoke to the police, she described the man who robbed her as
a young, very clean-cut African-American man who was about five feet two inches
tall and weighed about 150 pounds.  She also stated that she is not very good
at heights and weights.  At trial, she identified Carroll as the man who had
robbed her.

Also in the early morning hours of
September 17, 2007, Erik Scheets returned to his apartment complex in College
Station, Texas.  Between 2:30 and 3:00 a.m., he pulled into a parking spot and
saw three African-American men standing about twenty to thirty feet away.  When
he got out of his car, the men were walking toward him.  Scheets began walking
toward his apartment, greeted the men, and continued walking past them.  But just
after Scheets passed by the men, he heard the sound of a gun cocking, and one
of the men yelled for him to stop.  Scheets stopped and turned around.  The men
were standing “kind of in a triangle, two behind one.”  The man directly in
front of him was holding a small silver semi-automatic handgun.

The man with the gun told Scheets to
give them his wallet and cell phone.  Scheets complied, and the man looked
through the wallet.  Meanwhile, the other two men went through Scheets’s car
and took a laptop, an ipod, and several other things from the trunk.  When the
man with the gun discovered that Scheets did not have any money in his wallet,
he told Scheets to get back into his car so that he could go get the man some
money.  Scheets and the man with the gun then got into the car, and the man
told Scheets to drive to the nearest ATM.

As they were leaving the parking lot, a
police car passed them, and the man told Scheets not to try anything and
pressed the gun into Scheets’s ribs.  Once at the ATM, Scheets tried several
times to get money out of the machine but was unsuccessful because he did not
have much money in his account.  The man eventually told Scheets to go back to
his apartment.  Once Scheets returned to the apartment complex where the other
two men were waiting, the man with the gun told Scheets that because he could
not give him any money, the three men were going to go with Scheets to his
apartment and “get their money’s worth.”

After Scheets unlocked the door to his
apartment, the men told him to sit on the couch.  The man with the gun handed
it to one of the other men, who watched Scheets while the other two men went
through the different rooms of the apartment.  At some point, the two men
returned to the living room.  The man who had originally held the gun took the
gun back, held it to Scheets’s head, and asked Scheets if they had gotten
everything of value.  They then told Scheets not to call the police and not to
try and leave because they would be waiting.  They then left.

Several minutes later, Scheets left
through the sliding glass door because the men had taken his cell phone, and he
was unable to call the police.  Scheets flagged down a passing motorist who
helped him.  Scheets described to the police that the man holding the gun was approximately
six feet tall, had a muscular build, and was wearing a white tank top and baggy
gray shorts; his hair was cut short, and he was wearing a “do-rag” on his
head.  The man who watched him while they were in the apartment had a slender
build and was wearing plaid shorts.  Scheets testified that he also described the
third man as wearing a dark shirt, a cross necklace, and a red bandana.

Upon hearing of the robbery, a cashier
at a Valero gas station on the same street as Scheets’s apartment complex informed
a friend, who then told the police, that she had seen three African-American
men in the store around 11:30 p.m. on the same night as the robbery.  They had made
her nervous because they were acting “crazy,” laughing, cutting up, and
“smelled funny.”  She recognized one of the men as Damian, a regular customer
from another store where she had previously worked, and one of the other men
identified himself as “AJ” or “EJ.”  The police recovered the in-store video
from that night.

Detective Patrick Massey of the College
Station Police Department testified that he reviewed the video from the store, and
the appearances of the three men in the video were consistent with the
descriptions that Scheets had given him on the night of the robbery.  In
particular, one of the men who had robbed Scheets wore a red bandana, and one
of the men on the video had a red bandana tucked away in his pocket.  Detective
Massey thus contacted Scheets to review the video.  After reviewing the video,
Scheets identified the three men as those who had robbed him.  The man in the
video who identified himself as “EJ” is Carroll.  The other two individuals are
Damian Flowers and Milton McCloud.  At trial, Scheets identified Carroll as the
man that held the gun, made him drive to the ATM, and then took him back to his
apartment.

Carroll was convicted of the aggravated
robbery of Scheets.

ADMISSION OF EXTRANEOUS OFFENSE

In his first issue, Carroll contends
that the trial court abused its discretion by admitting the extraneous offense evidence
of the Garcia robbery under the identity exception of Rule 404(b) of the Texas
Rules of Evidence.  We will uphold the decision of the trial court concerning
the admissibility of the evidence unless the ruling rests outside the zone of
reasonable disagreement.  See Martin v. State, 173 S.W.3d 463, 467 (Tex.
Crim. App. 2005).

In Segundo v. State, 270 S.W.3d
79 (Tex. Crim. App. 2008), the Court of Criminal Appeals stated:

The general rule is that the defendant
is to be tried only for the offense charged, not for any other crimes or for
being a criminal generally.  However, evidence of extraneous acts of misconduct
may be admissible if (1) the uncharged act is relevant to a material issue in
the case, and (2) the probative value of that evidence is not significantly
outweighed by its prejudicial effect.  Because the propensity to commit crimes
is not a material fact in a criminal case, Rule 404(b) explicitly prohibits the
admission of uncharged acts to prove conduct in conformity with a bad
character.

 

One of the main rationales for admitting
extraneous-offense evidence is to prove the identity of the offender.  Here,
the theory of relevancy is usually that of modus operandi in which the
pattern and characteristics of the charged crime and the uncharged misconduct
are so distinctively similar that they constitute a “signature.”  Usually, it
is the accretion of small, sometimes individually insignificant, details that
marks each crime as the handiwork or modus operandi of a single
individual.  No rigid rules dictate what constitutes sufficient similarities;
rather, the common characteristics may be proximity in time and place, mode of
commission of the crimes, the person’s dress, or any other elements which mark
both crimes as having been committed by the same person.  But if the
similarities are “generic,” i.e., typical to this type of crime, they
will not constitute a “signature” crime.  Sometimes, however, the “signature”
is one unique characteristic.  For example, suppose that three bank robberies
are committed over a four-year period in different cities in which the robber
used an antique silver crossbow.  This scenario is so unusual that it is highly
likely that each robbery was committed by the same person using the same
antique silver crossbow.  This is “the mark of Zorro” mode of proving identity;
it is a remarkably unusual fact, in which a single detail suffices to establish
identity.

 

Id. at 71 (footnotes and citations omitted).

 

In this case, the trial court allowed
the State to present extraneous offense evidence of the Garcia robbery only for
the purpose of determining the identity of the offender.  Although Carroll does
not dispute that he raised the issue of identity at trial, he argues that the
trial court’s admission of the extraneous offense evidence was error because
the pattern and characteristics of the charged crime and the uncharged conduct
were not significantly similar such that they constituted a “signature.”  We
disagree.

The extraneous offense presented by the
State was committed in close proximity to the time and place of the charged
offense and by a common mode of commission.  See Dickson v. State, 246
S.W.3d 733, 742 (Tex. App.—Houston [14th Dist.] 2007, pet. ref’d) (“[T]he Court
of Criminal Appeals has held that extraneous offenses may be sufficiently
similar to prove identity where there is either proximity in time and place or
a common mode of committing the offense.”) (citing Ransom v. State, 503
S.W.2d 810, 813 (Tex. Crim. App. 1974)).  Both robberies were committed in the
Bryan/College Station area within an hour of each other on the morning of
September 17, 2007.  In both robberies, a clean-cut African-American male
approached the victims on foot just after they had exited their vehicles in the
parking lots of their respective apartment complexes.  Both victims heard the
sound of a gun cocking just before they saw a man with a silver gun.  Both
victims saw a red bandana.  In both robberies, the man with the gun immediately
asked for the victims’ purse/wallet and also took the victims’ cell phones.  Finally,
both victims identified Carroll as the man that held the gun on them and robbed
them.

Carroll argues that although there were
some similarities between the charged offense and the extraneous offense, the
incidents were also dissimilar.  For instance, Carroll states that the Garcia
robbery involved only one black male while the Scheets robbery involved three
black males.  But Garcia testified that she heard a rustling in the bushes and
someone say “go, go, go,” just before the man approached her with a gun.  This
indicates that more than one person was involved in her robbery as well. 
Furthermore, some dissimilarities between the charged crime and the extraneous
offense do not automatically make the extraneous offense inadmissible.  Dickson,
246 S.W.3d at 743; see Ransom, 503 S.W.2d at 813-14.  We conclude
that the trial court did not abuse its discretion in finding that the offenses
were sufficiently similar such that evidence of the extraneous offense was
admissible to prove the issue of identity.

In his first issue, Carroll also argues
that even if the trial court did not err in admitting the extraneous-offense
testimony under Rule 404(b), the evidence should have been excluded under Rule
403 because the prejudicial effect of the evidence significantly outweighed its
probative value.  Under Rule 403, otherwise relevant evidence “may be excluded
if its probative value is substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, or needless presentation of cumulative
evidence.”  Tex. R. Evid. 403.

In its seminal decision in Montgomery
v. State, the Court of Criminal Appeals identified four non-exclusive
factors to be considered in determining whether evidence should be excluded
under Rule 403.  810 S.W.2d 372, 389-90 (Tex. Crim. App. 1991) (op. on reh’g). 
Those factors were:  (1) the probative value of the evidence; (2) the potential
to impress the jury in some irrational, yet indelible way; (3) the time needed
to develop the evidence; and, (4) the proponent’s need for the evidence.  See
id. (citing 22 Charles A. Wright
& Kenneth W. Graham, Federal Practice and Procedure § 5250, at
545-51 (1978); Edward J. Imwinkelried,
Uncharged Misconduct Evidence §§ 2:12, 8:03, 8:07 (1984)); accord
Prible v. State, 175 S.W.3d 724, 733 (Tex. Crim. App. 2005).

 

More recently, the Court has looked to
the language of Rule 403 and restated the pertinent factors.

 

[A] trial court, when undertaking a Rule
403 analysis, must balance (1) the inherent probative force of the proffered
evidence along with (2) the proponent’s need for that evidence against (3) any
tendency of the evidence to suggest decision on an improper basis, (4) any
tendency of the evidence to confuse or distract the jury from the main issues,
(5) any tendency of the evidence to be given undue weight by a jury that has
not been equipped to evaluate the probative force of the evidence, and (6) the
likelihood that presentation of the evidence will consume an inordinate amount
of time or merely repeat evidence already admitted.  Of course, these factors
may well blend together in practice.

 

Gigliobianco v. State, 210 S.W.3d 637, 641-42 (Tex. Crim.
App. 2006) (footnotes omitted); accord Subirias v. State, 278 S.W.3d
406, 408 (Tex. App.—San Antonio 2008, pet. ref’d); Brock v. State, 275
S.W.3d 586, 590 (Tex. App.—Amarillo 2008, pet. ref’d); Stafford v. State,
248 S.W.3d 400, 411-12 (Tex. App.—Beaumont 2008, pet. ref’d); but see De La
Paz [v. State], 279 S.W.3d [336, 349 (Tex. Crim. App. 2009)] (applying Montgomery
factors).

 

Newton v. State, 301 S.W.3d 315, 319 (Tex. App.—Waco
2009, pet. ref’d) (footnote omitted).

            Probative force of the
evidence:  As discussed above, the extraneous-offense evidence of the
Garcia robbery is probative because it assists the jury in determining the
identity of the offender in the charged offense.  This factor weighs in favor
of admissibility.

            Proponent’s need for that
evidence:  Carroll argues that the State did not need the
extraneous-offense evidence of the Garcia robbery to establish identity because
Scheets positively identified Carroll at trial as the man who had held the gun
when he was robbed.  But the defense attacked Scheets’s identification during
cross-examination by questioning him about differences in descriptions of the
perpetrators’ clothing.  Further, during his opening statement and closing
argument, Carroll argued that the evidence did not support a finding that he
was the individual who robbed Scheets.

When identity is “a hotly contested
issue,” the State’s need to offer evidence of an extraneous offense is strong. 
Karnes v. State, 127 S.W.3d 184, 193 (Tex. App.—Fort Worth 2003, pet.
ref’d) (citing Lane v. State, 933 S.W.2d 504, 520-21 (Tex. Crim. App.
1996)).  In this case, identity was the seminal issue in dispute at trial. 
This factor thus weighs in favor of admissibility.

            Tendency of evidence to
suggest a decision on an improper basis:  In Lane, the Court of
Criminal Appeals provided:

As for the potential to irrationally
impress the jury, it is true that an extremely similar extraneous offense
always carries the potential to impress the jury of a defendant’s character
conformity, an impression the law seeks to avoid.  However, the impermissible
inference of character conformity can be minimized through a limiting
instruction.

 

933 S.W.2d at 520.  Here, the trial
court gave a limiting instruction to the jury, ordering them to consider
Garcia’s testimony only for the purpose of determining the identity of the
offender in the charged offense.  Thus, the extraneous-offense evidence had
limited potential to impress the jury in an irrational way.  This factor does
not weigh in favor of exclusion of the evidence.

            Jury confusion or
distraction, undue weight, and amount of time or repetition:  These factors
concern whether presentation of the evidence consumed an inordinate amount of
time or was repetitious, and the evidence’s tendency to confuse or distract the
jury or to cause the jury to place undue weight on its probative value.  See
Gigliobianco, 210 S.W.3d at 641-42; Newton, 301 S.W.3d at 320. 
Garcia’s testimony about her robbery was only about thirty pages of the
reporter’s record.  It was not repetitious, and we do not believe that it could
cause jury confusion or distraction or cause the jury to give it undue weight,
especially since the trial court gave a limiting instruction to the jury.  All
of these factors thus favor admission.

            Rule 403 “envisions
exclusion of [relevant] evidence only when there is a ‘clear disparity between
the degree of prejudice of the offered evidence and its probative value.’”  Hammer
v. State, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quoting Conner v.
State, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)).  We cannot say that
there is a “clear disparity” between the danger of unfair prejudice posed by
the extraneous-offense evidence and its probative value.  Thus, the trial court
did not abuse its discretion by overruling Carroll’s Rule 403 objection.  We
overrule Carroll’s first issue.

BATSON CHALLENGE

In his second issue, Carroll contends
that the trial court erred in overruling his Batson challenge because
the State used its peremptory challenges to eliminate all African Americans
from the jury panel and did not give racially neutral explanations for the
challenges.

The exclusion of a venire-member based
on race violates the Equal Protection Clause of the Fourteenth Amendment to the
United States Constitution.  U.S. Const.
amend. XIV; Batson v. Kentucky, 476 U.S. 79, 89, 106 S.Ct. 1712,
1719, 90 L.Ed.2d 69 (1986).  Batson provides a three-step process for a
trial court to use in adjudicating a claim that a peremptory challenge was based
on race.  Snyder v. Louisiana, 552 U.S. 472, 476, 128 S.Ct. 1203, 1207,
170 L.Ed.2d 175 (2008).  First, the defendant must make a prima facie
showing that a peremptory challenge has been exercised on the basis of race.  Snyder,
552 U.S. at 476, 128 S.Ct. at 1207; Watkins v. State, 245 S.W.3d 444,
447 (Tex. Crim. App. 2008).  Second, once the prima facie showing has
been made, the burden of production shifts to the State to articulate a
race-neutral reason for its strike.  Snyder, 552 U.S. at 476, 128 S.Ct.
at 1207; Watkins, 245 S.W.3d at 447.  Third, if the State tenders a
race-neutral explanation, the trial court must then decide whether the
defendant has proved purposeful racial discrimination.  Snyder, 552 U.S.
at 476, 128 S.Ct. at 1207; Watkins, 245 S.W.3d at 447.

If the opponent of a challenged strike
raises a question of purposeful discrimination, and the trial court proceeds
immediately to the State’s race-neutral reasons for the strike, a reviewing
court assumes that the opponent has satisfied the first step of the Batson
process.  Watkins, 245 S.W.3d at 447.  The second step of the process
does not demand an explanation that is persuasive, or even plausible.  Purkett
v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). 
The issue is the facial validity of the prosecutor’s explanation.  Id. 
Unless a discriminatory intent is inherent in the prosecutor’s explanation, the
reason offered will be deemed race neutral.  Id.

It is not until the third step that the
persuasiveness of the justification tendered for the strike becomes relevant.  Id. 
“At that stage, implausible or fantastic justifications may (and probably
will) be found to be pretexts for purposeful discrimination.”  Id.  In
evaluating the genuineness of the State’s proffered race-neutral reasons, we
may consider:  (1) whether the reason given is related to the facts of the
case; (2) whether the State meaningfully questioned the challenged venire
member; (3) whether persons with the same or similar characteristics as the challenged
venire member were not struck; (4) whether there was disparate examination of
the members of the venire; and (5) whether an explanation was based upon a
group bias although the specific trait is not shown to apply to the challenged
juror.  Williams v. State, 804 S.W.2d 95, 105-06 (Tex. Crim. App. 1991).

In Carroll’s case, the venire included
four African Americans.  Carroll used a peremptory strike to remove one of the
African Americans from the venire, and the State used its peremptory strikes to
remove the remaining three African Americans from the venire.  Carroll made a Batson
challenge, objecting that the State had struck the three African-American
members of the venire, Nos. 8, 10, and 23, on the basis of race.  The trial
court asked the State for its race-neutral reasons for the strikes.  The State
responded that it struck Nos. 8 and 10 because they were “very talkative” and
“had a lot of questions.”  No. 10 specifically had a lot of questions about the
possibility that the weapon used in the offense was not real.  Additionally, the
State said that it struck No. 8 because he was only twenty-four years old and
had been employed for less than nine months.  As to No. 23, the State stated
that it struck him because he was only twenty-six years old and because he
“just never talked.”

Carroll then cross-examined the
prosecutor.  The prosecutor testified that it was not unusual to have some
panel members who did not speak much, and he admitted that there were a number
of venire-members in this case who did not speak much.  Accordingly, he stated
that he did not strike anyone solely for their lack of talking but that it was
a consideration in his striking of three non-African-American venire-members. 
The prosecutor also testified that a “big factor” in striking Nos. 8 and 23 was
their age.  He said age was not a factor for No. 10 because he was
thirty-seven.  However, he was “so talktive [sic], asked so many questions
about issues of aggravated robbery, how it can and can’t be committed.”  The
prosecutor also stated that No. 10’s employment for only seven months was a
reason for the strike even though the State did not question any of the
venire-members about employment.

Carroll argued that “there are a number
of people in a similar situation that were not struck similarly by the State in
this case.”  He conceded that he understood why the State would have concerns
about No. 10, but he stated that No. 8 appeared to be a fairly strong juror for
the State.  The trial court found that the State had provided race-neutral reasons
for striking the venire-members, and it overruled Carroll’s objection.

We will begin with No. 10.  If a
defendant creates the impression that he is abandoning an objection, he waives
the right to complain of that alleged error on appeal.  See Purtell v. State,
761 S.W.2d 360, 366 (Tex. Crim. App. 1988).  Here, Carroll abandoned his Batson
challenge to the State’s strike of No. 10 after the State gave its race-neutral
reason for the strike.  Just before the trial court made its ruling, defense
counsel specifically stated:  “I agree with regards to . . . Juror No. 10.  He
was extremely talktive [sic], and I can understand the State having some
concerns about putting somebody on the panel who asked what about the gun,
maybe it wasn’t a gun, that kind thing.”  Thus, Carroll failed to preserve his Batson
challenge as to No. 10.  See id.

As for Nos. 8 and 23, we will assume
that Carroll satisfied his step-one obligation to make a prima facie
case of purposeful discrimination.  See Watkins, 245 S.W.3d at 447. 
Furthermore, Carroll does not dispute that the State offered race-neutral explanations
for striking Nos. 8 and 23.  See Partida v. State, 133 S.W.3d 738, 742
(Tex. App.—Corpus Christi 2003, no pet.) (“Youth and employment (or lack
thereof) are acceptable race-neutral explanations for striking a prospective
juror.”).  Instead, Carroll’s focus is on what he considers to be the State’s
inconsistent reasons for striking potential jurors.  Specifically, Carroll
complains that the State struck Nos. 8 and 10 in part because they were
talkative but then struck No. 23 in part because he never talked.  Carroll also
complains that the State struck Nos. 8 and 23 in part because of their young
age but then stated that it struck No. 10 in part because he was “over 30.”

First, the only discussion about No.
10’s age occurred in the following exchange:

[Defense counsel]:  And you said that
you struck -- in particular you struck . . . No. 8, No. 10, and No. 23 in large
part because of their age, is that right?

 

[Prosecutor]:  That’s a big factor,
yes.  Well, not on . . . No. 10, because he’s 37 years old.  The fact on him
was, first of all, the fact he was so talktive [sic], asked so many questions
about issues of aggravated robbery, how it can and can’t be committed, and the
fact that he’s been employed for seven months.

 

Thus, the State clarified that it did
not actually strike No. 10 because of his age.  Furthermore, a trial court’s
decision on whether the defendant has proved a Batson claim turns, in
part, on observations made during the voir dire examination.  Therefore, the
court’s determination of a Batson issue must be accorded great deference
on appeal.  King v. State, 129 S.W.3d 680, 682 (Tex. App.—Waco 2004,
pet. ref’d).  The trial court’s finding that peremptory strikes were not
racially motivated will be upheld on appeal if the finding is not “clearly
erroneous” when viewed in the light most favorable to that ruling.  Gibson
v. State, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004).

Given the record before us, we cannot
conclude that the trial court’s denial of Carroll’s Batson objection was
clearly erroneous.  We overrule Carroll’s second issue.

CONCLUSION

            Having overruled both of Carroll’s
issues, we affirm the trial court’s judgment.

 

REX D. DAVIS

Justice

 

Before
Chief Justice Gray,

Justice Reyna, and

Justice Davis

Affirmed

Opinion
delivered and filed December 15, 2010 

Do
not publish

[CRPM]

 

            *(Chief Justice Gray concurs in the
judgment of the Court affirming Carroll’s conviction.  A separate opinion will
not issue.  He notes, however, that he does not find that the characteristics
of this crime and the extraneous offense are sufficiently “unusual or
idiosyncratic” to make them the “signature” for the manner in which Carroll
commits his armed robberies.  Owens v. State, 827 S.W.2d 911, 914-15
(Tex. Crim. App. 1992) and Taylor v. State, 920 S.W.2d 319, 321-22 (Tex.
Crim. App. 1996), respectively.  What must be shown to make the evidence of the
extraneous offense admissible is something that sets it apart from its class or
type of crime in general, and marks it distinctively in the same manner as the
principal crime.  Ford v. State, 484 S.W.2d 727, 730 (Tex. Crim. App.
1972).  He concurs because he finds the error harmless.  As to the Batson
issue, he finds he must agree with the Court’s holding under the “clearly
erroneous” standard of review.  Grant v. State, No. PD-1059-09, 2010 Tex. Crim. App. LEXIS 1566, *2-3 (Tex. Crim. App. Nov. 17, 2010).  But how strange it is that the race neutral reason given can be another classification with similar
protections as race and gender; that being age.  And it is also ironic that the
race-neutral reason given beyond age is that one prospective juror talked too
much and the other talked too little.  This case presents a compelling exhibit
for the Honorable Levi Benton’s argument to eliminate preemptory strikes.  If
we fail to limit the improper use of preemptory strikes by striking down only
the most egregious examples of race and gender discrimination, I fear we
endanger the very existence of this powerful tool for jury selection in Texas.)