Filed 3/20/13  P. v. Loftin CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B237075 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA048066) |
| v. | |
| THOMAS JONATHAN LOFTIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John Murphy, Judge.  Affirmed.

A. William Bartz, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Blythe J. Leszkay and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Thomas Jonathan Loftin was convicted by a jury of attempted grand theft by false pretense.  On appeal Loftin contends the prosecutor improperly excluded African Americans from the jury when exercising peremptory challenges.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Information*

Loftin was charged in an amended information with grand theft of personal property (count 1) (Pen. Code, § 487, subd. (a)) and grand theft by embezzlement (count 2) (*ibid.*).  He pleaded not guilty and demanded a jury trial.

2. *The Trial*

According to the evidence at trial, in August 2008 Loftin agreed to repair and restore Juan Veloz's 1948 Chevrolet Fleetline Aerosedan for $13,900 with a $7,000 down payment.  Between August 2008 and January 2009 Loftin and Veloz modified the contract several times based on Loftin's representations that additional sums were needed to complete the repairs and restoration.  The last novation, in January 2009, modified the contract price to $22,400.  Veloz agreed to make additional payments toward the new contract price prior to the completion of the work.

For a while it appeared Loftin was working on the car:  In October 2008 Veloz received e-mails from Loftin with attached photographs purporting to show the car had been sandblasted to remove rust and powder coat had been applied to the frame.  However, after making a $5,000 payment to Loftin in January 2009,[1] Veloz was unable to contact him.  In addition, Veloz noticed his car was no longer at Loftin's shop.

In May 2009 Loftin told Veloz he could find his car at another shop in Palmdale, and the two men arranged to meet.  Loftin demanded a further advance payment toward the $22,400 contract price; Veloz refused.  The meeting ended with Loftin assuring Veloz the repairs would be completed in the next few months.

Several months passed, and Veloz was again unable to reach Loftin or locate his car.  The shop where Veloz had last seen the car was now vacant and a for-lease sign was

---

[1]     Veloz had paid Loftin $17,000 by this point.

2

posted on its window. In October 2009 Veloz successfully contacted Loftin, who told Veloz his painter had absconded to Mexico with $4,000 Loftin had paid him to work on the car. Loftin claimed he did not know what the painter had done with Veloz's car. Later, Loftin told Veloz his car was in storage and it would cost Veloz an additional $30,000 for the car to be repaired and restored. Loftin refused to tell Veloz where the car was being stored.

In November 2009, after several unsuccessful attempts by Veloz and his attorney to locate the car, Veloz contacted the Los Angeles County Sheriff's Department. With the assistance of Deputy Sheriff Mark Mechanic, in December 2010 Veloz located the car at a tow yard. The car was missing several parts. No work had been done on it since January 2009.

The People asserted at trial that, no later than January 2009, Loftin knew he could not restore the car in accordance with the contract and intentionally deceived Veloz into giving him more money on the pretense it was needed to complete the job. They also argued Loftin had stolen more than $2,000 in parts from the car. Veloz contended this was a simple contract dispute and there was no intent to steal or defraud.

3. *Voir Dire*

During voir dire defense counsel moved to strike the entire jury panel contending the People's use of their peremptory challenges to exclude two African Americans from the jury constituted racially motivated group bias in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005) 545 U.S. 162, 168-173 [125 S.Ct. 2410, 162 L.Ed.2d 129].) The court denied the motion, finding Loftin had failed to make a prima facie case the peremptory challenges were racially motivated.

4. *The Verdict and Sentence*

The jury acquitted Loftin of grand theft by false pretense as charged in count 1, but found him guilty of attempted grand theft by false pretense, a lesser included offense. The jury acquitted Loftin of embezzlement as charged in count 2. Loftin was sentenced

3

to the upper term of 18 months on count 1 to be served in county jail.  (Pen. Code, § 1170, subd. (h)(1) & (2).)

## DISCUSSION

1. *Voir Dire Proceedings*

During voir dire defense counsel discussed with the prospective jurors the concept of false accusations:  "[W]e can all, as responsible citizens, make our conduct what it should be under the law.  We can do what we are supposed to do.  But what happens when somebody accuses you falsely, they just lie to you?"  Juror 9 spontaneously stated, "Oh yeah."  Later, defense counsel asked, "What about the fact that Mr. Loftin is Black.  Does that cause a problem for anybody in this case?"  Juror 9 asked, "How do we know he is Black?"  Asked by his lawyer whether he was Black, Loftin said, "My birth certificate says yes."

Later in voir dire the prosecutor presented the following hypothetical about circumstantial evidence:  "Let's say you're sitting inside of a room and this room doesn't have any windows, so, basically, you can't see what the weather is like outside . . . .  [A] person walks into that room from the outside.  And when the person walks into the room, the person has a raincoat on, and [is carrying] an umbrella.  And as that person is walking into the room, they are putting down the umbrella and shaking the umbrella and there [are] drops of water . . . that are flying off that umbrella.  And on the raincoat, there's beaded up water that's dripping off of the raincoat and you can't ask that person what the weather is like outside. . . .  But, based upon what you've seen, based upon the raincoat and the drops of water and the umbrella, can you say that you know what the weather is like outside based on that?"  One of the prospective jurors answered, "I'm going to presume it was raining."

Defense counsel proffered a different explanation for the prosecutor's scenario:  "One reasonable explanation, it is raining outside.  Another reasonable explanation is somebody could have doused them with water from a firehose, right . . . ?"

At his next turn to ask questions to the prospective jury panel, the prosecutor turned his attention to Juror 10:  "I saw you shaking your head yes when [defense

4

attorney] was talking about . . . other reasonable explanations for why the gentlemen comes in and he's got the water on his raincoat and got the water on his umbrella. Am I fair in saying that?" Juror 10 replied, "Yes." After getting Juror 10 to acknowledge it rarely rains in Lancaster, the prosecutor probed further: "So a person who is in Lancaster, walking into a room with a raincoat on and an umbrella, do you think it's reasonable for a rational person like that to have, you know, been wearing a raincoat and an umbrella in the first place and going outside in a raincoat and holding an umbrella when it's not a rainy day? Do you think that's reasonable?" Juror 10 replied, "It's reasonable." The prosecutor continued: "Anything is possible. . . . But is it reasonable to think that the same person who is rational and reasonable was putting on a raincoat, was carrying an umbrella, had the umbrella up and then was randomly doused by somebody who was holding a bucket of water outside the room? Is that reasonable?" Juror 10 replied, "It's gray. It's gray."

The People used their fourth peremptory challenge to excuse Juror 9 and later used their sixth peremptory challenge to excuse Juror 10.[2] At that point defense counsel requested a side bar to raise a *Batson/Wheeler* objection because both Jurors 9 and 10 were African American. Asked for an explanation, the prosecutor stated he excused Juror 10 because, in the People's view, there was no other way to view the hypothetical presented other than the fact that it was raining. Juror 10, he noted, had "vehemently [shaken] his head up and down" in response to defense counsel's proffered explanation, suggesting he agreed strongly with the defense. The prosecutor explained, "I don't want a jury who I think at the [outset] accepts unreasonable interpretations of the circumstantial evidence."

As to Juror 9, the prosecutor explained he found the juror's comment, "How do we know he is Black?" troubling because, to the prosecutor, the defendant was clearly

---

[2]     The record shows the People used six peremptory challenges, only two of which were directed to African Americans. Three White and one Hispanic prospective jurors were also excused by the People. As finally comprised, the jury contained four African Americans and one African-American alternate.

African American and the comment reflected a contrarian nature. The prosecutor stated, "I can never prove something to him beyond a reasonable doubt when the defendant is pretty clearly African American." In addition, the prosecutor took issue with Juror 9's spontaneous exclamation "Oh yeah," in response to defense counsel's statements concerning false accusations. To the prosecutor, it appeared Juror 9 was partial to the notion of false accusations, and "I don't want someone who is in agreement with that kind of sentiment coming from the defense. So those are the People's concerns."

The trial court denied the motion, concluding Loftin had failed to establish a prima facie case establishing group bias based on race in jury selection.

2. *Governing Law on Racially Motivated Peremptory Challenges*

The exercise of peremptory challenges to remove prospective jurors based on group bias violates both the California and the United States Constitutions. (*People v. Ward* (2005) 36 Cal.4th 186, 200, citing *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277 and *Batson, supra*, 476 U.S. at p. 89.) The procedural and substantive standards trial courts properly use when considering motions challenging peremptory strikes are well-established: "'""First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.'"'" (*People v. Hamilton* (2009) 45 Cal.4th 863, 898, quoting *Snyder v. Louisiana* (2008) 552 U.S. 472, 476-477 [128 S.Ct. 1203, 170 L.Ed.2d 175].)

"[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California, supra,* 545 U.S. at p. 170.) In considering whether a prima facie case was established, "certain types of evidence may be especially relevant: '[T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question

6

share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole.  Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all.  Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.'" (*People v. Bonilla* (2007) 41 Cal.4th 313, 342.)

"When the trial court concludes that a defendant has failed to make a prima facie case, we review the voir dire of the challenged jurors to determine whether the totality of the relevant facts supports an inference of discrimination."  (*People v. Lancaster* (2007) 41 Cal.4th 50, 74, citing *Johnson v. California*, *supra,* 545 U.S. at p. 168 & fn. 4.)

3. *Loftin Failed To Establish a Prima Facie Case for Group Bias in Jury Selection*

Loftin contends the People's use of three of its six peremptories to excuse minority jurors (two African Americans and one Hispanic juror) was statistically sufficient, by itself, to establish a prima face case of discrimination, thus shifting the burden to the People to establish race-neutral reasons for their actions.  At the threshold, Loftin's argument in the trial court was limited to the exercise of two peremptory challenges to excuse African Americans.  By failing to raise it in the trial court, Loftin has forfeited any argument the People used additional peremptory challenges to excuse minority jurors generally.  (*People v. Lewis* (2008) 43 Cal.4th 415, 481 [failure to assert a particular *Wheeler/Batson* objection results in forfeiture of issue on appeal].)  In any event, although a systematic pattern of exclusion is sufficient to raise an inference of discrimination, ""'[a]s a practical matter,"'" a small sample size in this case makes any inference of a pattern difficult to discern.  (*People v. Bonilla* (2007) 41 Cal.4th 313, 343 [when sample size is small, the challenge of one or two jurors ""'can rarely suggest a *pattern* of impermissible exclusion"'"]; *id*. at p. 343, fn. 12 [no prima facie case

7

established by virtue of using two of five peremptory challenges excluding the only two African Americans; "[s]uch a pattern will be difficult to discern when the number of challenges is extremely small"].)

Moreover, any inference of group bias based on this statistic alone, to the extent one arguably exists, is wholly eviscerated when considered together with the fact one of the replacement jurors was also African American; and, in fact, one third of the jury as finally selected was made up of African Americans. (See *People v. Turner* (1994) 8 Cal.4th 137, 168 ["[w]hile the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial court to consider in ruling on a *Wheeler* objection"]; see, e.g., *People v. Gray* (2005) 37 Cal.4th 168, 187-188 ["the exclusion of two African-American jurors and the retention of two failed to raise an inference of racial discrimination"]; *People v. Thomas* (2012) 53 Cal.4th 771, 796 [when African Americans constituted 26 percent of prospective jurors called into the jury box and the prosecutor exercised 37 percent of his challenges (six out of 16) to excuse African Americans, the disparity was "not significant enough, in itself, to suggest discrimination"]; see generally *People v. Carasi* (2008) 44 Cal.4th 1263, 1294 ["prosecutor's pattern of excusals and acceptances during the peremptory challenge process reveals no obvious discrimination towards female jurors and is patently inconsistent with any such inference"].)

The record of voir dire also shows clear race-neutral reasons for excusing the two African American potential jurors. When presented with a hypothetical approximating the very definition of circumstantial evidence articulated in CALCRIM No. 223,[3] Juror 10

---

3    CALCRIM No. 223 provides in part, "Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question. For example, if a witness testifies that he saw someone come inside wearing a raincoat covered with drops of water, that testimony is circumstantial evidence because it may support a conclusion that it was raining outside."

8

professed resistance to the prosecutor's argument that only one reasonable explanation existed. Similarly, Juror 9's outburst, "Oh yeah," in response to the defense theory of false accusations could be interpreted by a prosecutor to reflect that juror's agreement with that defense theory.

In sum, the voir dire provided the prosecutor with ample grounds for reasonably challenging Jurors 9 and 10. Considering the record as a whole, the court did not err in concluding defense counsel had failed to make a prima facie showing of race-based group bias in selecting a jury. (See *People v. Howard* (2008) 42 Cal.4th 1000, 1018 [we must sustain trial court's assessment that defendant failed to make a prima facie case of racial discrimination in the exercise of peremptory challenges "if, upon independently reviewing the record, we conclude the totality of the relevant facts does not give rise to an inference of discriminatory purpose"].)[4]

---

[4]     Citing *People v. Lewis, supra,* 43 Cal.4th at page 471, Loftin insists we may infer from the trial court's request for the prosecutor's explanation that it found a prima facie case had been established. *Lewis,* however, makes clear that such implicit findings are not appropriate when, as here, the trial court expressly found no prima facie case had been made. (*Id.* at pp. 470-471; see *People v. Bittaker* (1989) 48 Cal.3d 1046, 1091-1092 [where trial court expressly found a prima facie case had not been established, it was improper to infer an implied finding a prima facie case had been made]; see generally *People v. Bonilla, supra,* 41 Cal.4th at p. 343, fn. 13 ["[t]hough not strictly required, it is the better practice for the trial court to have the prosecution put on the record its race-neutral explanation for any contested peremptory challenge, even when the trial court may ultimately conclude no prima facie case has been made out"].) In any event, even if a prima face case had been established, the record, as we have explained, shows legitimate, nondiscriminatory reasons for the prosecutor's actions. (*People v. Lenix* (2008) 44 Cal.4th 602, 613 [even a "trivial" reason, so long as it is genuine and race-neutral, will suffice to overcome *Batson/Wheeler* objection].)

**DISPOSITION**

The judgment is affirmed.

PERLUSS, P. J.

We concur:

ZELON, J.

JACKSON, J.