# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

TIMOTHY FITZGERALD TENNILLE,

      Defendant-Appellant.

FOR PUBLICATION
April 14, 2016

No. 323059
Wayne Circuit Court
LC No. 14-001678-FC

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

SEAN DANIEL RUTLEDGE,

      Defendant-Appellant.

No. 323314
Wayne Circuit Court
LC No. 14-001679-FC

Before: SHAPIRO, P.J., and O'CONNELL and GLEICHER, JJ.

O'CONNELL, J. (*concurring*).

At issue in this case is whether a prospective juror's non-verbal response to a question is a sufficient race neutral reason to withstand a *Batson*[1] challenge. I write separately to emphasize the special importance of non-verbal communication in the jury selection process and to disagree with the majority opinion's implied assertion that non-verbal communication is not a sufficient reason to peremptorily excuse a prospective juror.

I concur with the majority opinion that the trial court failed to complete the three-step *Batson* analysis, and therefore this case must be remanded for an evidentiary hearing. On remand, I would direct the trial court to make factual findings regarding the jurors' non-verbal responses, the prosecutor's credibility, and whether the prosecutor's challenge was a pretext for

---

[1] *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).

-1-

purposeful discrimination. On remand, I would direct the trial court to conduct an evidentiary hearing if necessary.

## I. INTRODUCTION

At issue in this case are the non-verbal responses of two African American prospective jurors. After the prosecutor excused these two jurors based solely on their non-verbal responses to a question, the defense counsel raised a *Batson* challenge. The majority opinion impliedly asserts in part that the non-verbal responses of these two jurors do not reach the level of significance to survive a *Batson* challenge and that the trial court's factual findings are incomplete. In part, I disagree. I note that one of the most important criteria in selecting a jury includes a potential juror's facial expressions, body language (non-verbal communication), and manner of answering questions. *People v Robinson*, 154 Mich App 92, 94-95; 397 NW2d 229 (1986). I would further emphasize that, as a reviewing court, we "cannot see the jurors or listen to their answers to voir dire questions." Id. at 94. For this reason, most appellate courts are disinclined to rule on the effect of non-verbal responses until the trial court first makes its factual findings; unfortunately, this lower court record is devoid of the trial court's factual findings regarding these issues. Therefore, I believe a remand to the trial court for factual findings is the proper remedy in this case.

## II. BACKGROUND FACTS

Charles Whitfield died after being shot twice in his back outside a gas station. According to Crystal Williams, Whitfield stopped at the gas station while giving her and Carmen Ulmer a ride home from work. Ulmer testified that she and Whitfield went into the gas station, and Williams testified that she saw two people enter the gas station after Whitfield and Ulmer.

According to Ulmer, two men came into the gas station and stood behind Whitfield at the cashier's booth. When Ulmer left, the two men were still behind Whitfield. Ulmer went back to Whitfield's truck, but eventually she returned to the gas station because Whitfield had not come out yet. Whitfield was reading a newspaper by the front door, and Ulmer told him that Williams wanted him to "come on." At that point, Ulmer ran back to the car and told Williams that they should leave because she noticed that the two men had not purchased anything, it was late, they were wearing all black, and "common sense was telling [her] that . . . something was about to happen."

Williams testified that she saw Whitfield and some other people come out of the gas station. According to Ulmer, the two men left the gas station as soon as Whitfield left. They were close behind Whitfield when he approached the truck. Ulmer heard someone say "aye," she saw guns and she ran. Ulmer ran in one direction and Williams ran in another. Ulmer heard Whitfield say "[n]o, no, no," and then she heard two or three gunshots. When Ulmer looked back, Whitfield was on the ground behind his truck.

Ulmer could not identify the men involved in the shooting because she did not look at them closely. Williams testified that she could not identify the men because she was distracted.

Sergeant Ron Gibson, an expert in forensic video analysis, testified that he obtained video evidence from the gas station's cameras. According to Gibson, the quality of the videos

was poor but he could see that one of the perpetrators had arm tattoos. As part of Gibson's analysis, he created photographs from the video and then photographed Tennille's arm tattoos for comparison. He compared photographs, looking for "patterns, density, and basically consistency of tattooing or marking on the skins, in the same positions, [on the] same arms." Gibson found "matching placements of tattooing" between Tennille and one of the perpetrators. Specifically, the right arm tattoos had similar densities and proportions, including script lettering in the style of an "l," the shape of clasped hands, and a line of lettering and design. Gibson testified that "[a] sufficient number of similarities are present" to "prevent this examiner from excluding [Tennille] from consideration."

Tennille's mother testified that she could not recall making statements to police. However, she acknowledged that a signature on the back of some photographs looked like hers, and she told police that she was 100% certain that the person in one of the photographs "look[ed] like my child."

Turquoise Irwin testified that she did not know Rutledge "personally" but had "seen him around" and knew him as "Merf." According to Irwin, police showed her photographs. Irwin identified one of the individuals as Tennille and the other as Merf. In the video of Irwin's interview with police, she identified "Tim" and "Merf" in response to the officer's question, "Who is this?" Irwin testified that she was being held in police custody and felt threatened by the police. Specifically, she was concerned that the police would charge her as an accessory to the crime if she did not cooperate.

During deliberations, the jury twice reviewed the video evidence. Ultimately, the jury found Tennille and Rutledge guilty of first-degree premeditated murder, felony murder, and felony-firearm. Tennille and Rutledge now appeal.

## III. EXCLUSION OF AFRICAN AMERICAN JURORS

### A. LEGAL STANDARDS

The Equal Protection Clause of the Fourteenth Amendment prohibits a party from using a peremptory challenge to remove a prospective juror solely on the basis of race. *People v Knight*, 473 Mich 324, 335; 701 NW2d 715 (2005). When a defendant alleges that the prosecution has improperly excluded a prospective juror on the basis of race, courts engage in a three-step analysis to determine whether the defendant has shown a case of unlawful discrimination. *Batson v Kentucky*, 476 US 79, 96-98; 106 S Ct 1712; 90 L Ed 2d 69 (1986). First, the defendant must make a prima facie showing that (1) he or she is a member of a racial group, (2) the prosecution has used a peremptory challenge to exclude a member of that group from the jury pool, and (3) the circumstances raise an inference that the exclusion was based on the prospective juror's race. *Id*. at 96. Second, if the trial court determines that the defendant made a prima facie showing, the prosecution must "articulate a race-neutral explanation for the strike." *Id*. at 97. Third, the trial court must determine whether the race-neutral explanation is a pretext and the defendant has proved purposeful discrimination. *Id*. at 98.

When reviewing the trial court's decisions, we review for clear error its factual findings and review de novo its legal determinations. *Knight*, 473 Mich at 338. We review de novo

whether the prosecution has articulated a race-neutral explanation for striking a prospective juror. *Id*. at 343. We review for clear error the trial court's findings regarding whether the prosecution's explanation was a pretext and whether the defendant has proved purposeful discrimination. *Id*. at 344-345. We accord the trial court's ultimate finding "great deference." *Id*. at 334.

## B. EXCLUSION OF AFRICAN AMERICANS FROM THE JURY

Both Tennille and Rutledge contend that the prosecution denied them equal protection by excusing two African American prospective jurors during the voir dire process. Tennille and Rutledge contend that the trial court clearly erred when it determined that the prosecution's stated reasons for dismissing the jurors were not a pretext.

In this case, the prosecution stated that it was seeking to exclude the two jurors because, when another prospective juror stated that he would believe police officers "almost to a fault" and give their testimony more credibility than that of a normal witness, the two jurors "show[ed] disgust," and "their reaction to his statements were just over the top[.]" While most people reacted to the statements in some way, the prosecution believed that those two specific jurors' reactions were "excessive." As a result, the prosecution decided that the jurors might be biased against police officers.

It is undisputed that Tennille and Rutledge have made a prima facie showing under *Batson*. Further, the trial court properly determined that, as a matter of law, the prosecution's stated reason was race-neutral. A neutral explanation is "an explanation based on something other than the race of the juror." *Hernandez v New York*, 500 US 352, 360; 111 S Ct 1859; 114 L Ed 2d 395 (1991) (plurality opinion). The second-step inquiry is focused only on the face of the explanation, and the persuasiveness of the explanation is an issue for the third step of the inquiry. *Knight*, 473 Mich at 343. In this case, the prosecution's stated reason concerned juror bias, an explanation which had nothing to do with the race of the prospective jurors. This reasoning was not based on the jurors' race. The trial court properly determined that the explanation was race-neutral, and thus the question is whether this reason was merely a pretext for racial discrimination.

Rutledge asserts that it is incredible that the prosecution could have surveyed the faces of the entire jury venire to gauge their responses to one prospective juror's answer to a question. I am not definitely and firmly convinced that the trial court made a mistake when it found the prosecution's stated reason valid. This Court gives deference to the trial court's findings, particularly regarding things that cannot be determined through a transcript, such as attorney credibility and the demeanor of prospective jurors. *Snyder v Louisiana*, 552 US 472, 479; 128 S Ct 1203; 170 L Ed 2d 175 (2008).

In this case, the prosecution's stated reason involved the prospective jurors' non-verbal communication. The prosecutor stated that he was observing the reactions of prospective jurors in response to another prospective juror's answer. I note that the record does not reflect the facial expressions of the jurors, and I have no basis from which to determine whether the prosecution's statement was true or false. Generally, the trial court is in a position to observe not only the prosecutor, but also the prospective jurors in the venire. The trial court may very well

have found the prosecutor credible. Appellate courts are not in a position to second-guess the trial court's finding on these matters, but unfortunately, the trial court's findings are almost non-existent. While the trial court ruled in favor of the prosecution, it did not make sufficient findings of fact for this Court to engage in any meaningful review.

I note that the prosecution exercised several other peremptory challenges, and there is no indication in the record that these challenges were based on race. Further, there is no indication of the ultimate jury composition and whether it disproportionately or entirely excluded African Americans. There is simply a lack of record evidence and the trial court's factual findings to support that the prosecutor's reason was or was not a pretext for purposeful discrimination. In this instance, the proper remedy is a remand for further factual findings.

On remand, I would direct the trial court to make factual findings regarding the jurors' non-verbal responses, the prosecutor's credibility, and whether the defendants established purposeful discrimination. I would direct the trial court to conduct an evidentiary hearing if necessary.

/s/ Peter D. O'Connell