# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

TIMOTHY FITZGERALD TENNILLE,

       Defendant-Appellant.

UNPUBLISHED
December 29, 2016

No. 323059
Wayne Circuit Court
LC No. 14-001678-01

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

SEAN DANIEL RUTLEDGE,

       Defendant-Appellant.

No. 323314
Wayne Circuit Court
LC No. 14-001-679-01

---

AFTER REMAND

Before: SHAPIRO, P.J., and O'CONNELL and GLEICHER, JJ.

PER CURIAM.

We remanded these cases to the trial court to more thoroughly consider whether the prosecutor set forth a race-neutral explanation for using peremptory challenges to remove African-Americans from the jury and if so, whether defendants met their burden of establishing that these reasons were merely pretextual. We directed the trial court to make specific factual findings in support of its resolution of these issues. In determining whether the prosecutor's juror strikes were racially motivated, we directed the court to "evaluate the plausibility of the prosecutor's race-neutral explanation for a strike 'in light of all evidence with a bearing on it.' " *People v Tennille*, ___ Mich App ___; ___ NW2d ___ (Docket No. 323059, issued April 14, 2016), slip op at 12 (*Tennille I*). To assist the trial court, we provided examples of facts relevant to this consideration: "the number of minority jurors in the jury box at the time of the strikes, the number of minority jurors on the final jury, the prosecutor's demeanor and credibility at the time

-1-

he made the strikes, and the credibility of the 'officer in charge' " whose opinion allegedly played a role in the prosecutor's decision. *Id*.

On remand, the court took testimony from the prosecutor and defense attorneys who attended the trial and recounted the court's own memory of the events in question. The court concluded that the prosecutor peremptorily struck the subject potential jurors based on their reactions to another potential juror's voir dire answers, and that those reactions suggested anti-police attitudes. Accordingly, the circuit court again rejected defendants' challenges regarding the prosecutor's racial motivation. After careful review of the record on remand, we discern no ground for relief.

As this dispositive issue has been resolved, we must also consider the evidentiary issues raised in defendants' original appellate briefs. These claims lack merit and we affirm.

## I. *BATSON* CHALLENGE

In brief summary, the controversy in this case centers on the prosecutor's use of peremptory challenges to strike two African-American women from the jury venire: WB and DC. According to the prosecutor, WB and DC exhibited extreme reactions to the comments of another potential juror, JG. JG insisted that he bore a "natural bias" toward law enforcement and was "99.9 percent" certain he would "automatically believe" an officer testifying at trial. The prosecutor had already employed three peremptory challenges to excuse other African-Americans from the jury venire. Accordingly, defendants' attorneys attacked the challenge of WB and DC as racially motivated, invoking *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986). The record was insufficient to address defendants' concerns and we remanded in *Tennille I*.

On remand, the prosecuting attorney, Terry Anderson, testified that he "[s]omewhat" recalled jury selection in this case. On the first day of the hearing, Anderson did not possess his trial notes. However, on the second day, he was able to present the "juror seating chart" upon which he relied. Anderson described that after JG's commentary, he "started noticing what the other jurors were thinking . . . ." "It was just an audible sort of, I would describe it as a sigh." And "[t]he sigh caught [Anderson's] attention to the point where [he] wanted to see what was actually transpiring in the pool." Anderson swiveled in his chair to look at the audience.

In relation to WB and DC, Anderson believed their reactions indicated "they would be not in favor of law enforcement." WB was in the jury box at the time of JG's comments and so Anderson observed her reaction first. Anderson described that WB reacted with "dropped hands, kind of shaking the head side to side, kind of looking up in the sky." When Anderson turned in his chair, DC was sitting to his right. Anderson witnessed a similar reaction from her: "the rolling of the eyes, looking towards the sky, the sort of dropping of hands, slight shaking of the head as in a 'no' direction. . . ."

At the original trial, Anderson noted, "But those two jurors' reactions were excessive. To the point where my officer in charge pointed it out to me." *Tennille I*, ___ Mich App at ___, slip op at 5. We originally believed Anderson may have relied solely on the officer's description when forming his challenge. At the hearing, the appellate prosecutor queried:

-2-

*Q.* . . . [W]hen you made that statement, did you mean to express that you had not seen it, but the Officer in Charge saw it and pointed it out to you?

*A.* No, that was not my intention by that statement.

*Q.* Okay. So when you said that that what he pointed out to you solidified what you had in your mind, was he just confirming what you had already seen?

*A.* Yes.

*Q.* Okay. Any conclusion that you had not seen it is a misinterpretation of that statement?

*A.* That's correct.

Anderson did not request the court to ask more probing questions of WB and DC to determine their biases. Anderson explained that WB's and DC's answers to such questions "would still not negate what I saw":

Because once I saw their reaction to that juror's statement, in my mind, there was a possible bias there. And if someone's asked, if someone's put on the spot and asked a question about their bias, they may or may not become forthright with their answer.

But to me, I guess, I guess you can kind of say their actions would speak loud or louder than words. I saw their actions, and I had made up my mind.

And when the court conducts voir dire rather than the attorneys, Anderson continued, "it forces you to rely on other things," such as "body language." Anderson interpreted the potential jurors' nonverbal responses based on his educational and professional experience: he earned a Bachelor's Degree in communications and had been a prosecutor for 8½ years, during which time he had conducted 80 to 100 trials.

Overall, Anderson denied that he had "any particular attitude" toward African-Americans or African-American women on juries. Anderson himself is African-American. He used nine of his allotted 20 peremptory challenges. He made no notes regarding the race of the individuals he peremptorily struck. Accordingly, Anderson could provide no explanation for his peremptory challenges to three other African-American potential jurors. In the end, Anderson remembered that he did not strike all the African-Americans from the jury venire and the jury selected was racially diverse.

Defendant Tennille's trial counsel, Michael McCarthy, testified that he did not recall "over-the-top reactions" from any potential jury member in response to JG's comments. However, McCarthy admitted, "I never pay any attention to what's going on behind me . . . . I would be completely oblivious to [it]."

Defendant Rutledge's counsel, Wyatt Harris, on the hand, had a more vivid recall of the voir dire in this case. When the jury venire entered the courtroom, Harris noted that 14 of the

-3-

total 52 potential jurors were African-American. Harris indicated that Anderson had employed three peremptory challenges to excuse African-Americans from the jury venire before challenging WB and DC. Accordingly, Harris requested a sidebar to discuss the issue. Harris denied that WB and DC reacted in a manner that "stood out" from the rest of the venire. In particular, Harris did not believe WB's "reaction was any different than the other jurors." Unlike Anderson, Harris had no memory of the racial composition of the jury selected.

The circuit court again rejected defendants' *Batson* challenges. The court indicated that it "does recall the side bar conference" held during voir dire as well as "the actions of the two jurors who were the subject of that challenge." At the sidebar, Harris expressed concern that Anderson had chosen to excuse two more African-Americans from the jury venire as he had already peremptorily challenged three others. "Mr. Anderson," the court continued, "stated that there was no pattern established because he had excused both African American and non-African American jurors."[1] Anderson also provided a "race-neutral reason for excusing" WB and DC— that their reactions to JG's comments suggested "that those jurors may have a bias against police officers." "The Court recalled seeing those reactions the previous day and found Mr. Anderson's proffered explanation to be a valid race-neutral reason . . . ." The court further indicated that it found Anderson credible given the court's personal observations of the subject venire members.

> This Court observed WB, who was already seated in seat #7 of the jury box, and DC, who was in the audience seated near the jury box, becoming more and more animated and agitated during the lengthy exchange with JG where he expressed a bias in favor of police and indicated that he would believe police 99.9 percent. Many of the jurors, both in the jury box and in the audience, had mild reactions, such as a sigh, or crossing their arms in front of them. However, the reactions of both WB and DC, were more extreme.

> The Court specifically recalls WB throwing her hands down to her sides and her head back against the seatback and a look of disgust on her face . . . . Likewise, the Court observed DC shaking her head, rolling her eyes and giving a snort of derision during the exchange with JG.

> These reactions seemed to indicate to both Mr. Anderson and to the Court that these two jurors strongly disagreed with JG's pro-police attitude. None of the attorneys requested that the court make any further inquiry of WB or DC and Mr. Harris asked for an opportunity to place his challenge on the record later in the proceedings.

In relation to the jury composition, the court conceded that "[t]here is no record of how many African Americans were remaining in the jury box after WB and DC were excused or how many were still in the remainder of the panel seated in the audience." Yet, the court accepted

---

[1] We again remind the trial court that this fact is irrelevant. The striking of a single African-American juror for invalid reasons violates the Equal Protection Clause. See *Snyder v Louisiana*, 552 US 472, 478; 128 S Ct 1203; 170 L Ed 2d 175 (2008).

Anderson's testimony that "he was positive that there were still some African Americans that ultimately sat on the jury."

A

As described in *Tennille I*, ___ Mich App ___, slip op at 1, "[a] well-known three-step process guides" judicial consideration of "whether purposeful discrimination motivated" a prosecutor's dismissal of a potential juror. First, the defendant must establish a prima facie case of discrimination. The burden then shifts to the prosecutor to provide a race-neutral explanation for the challenge. Finally, the burden returns to the defendant to prove the race-neutral explanation is mere pretext. *Id*. at ___, slip op at 1-2.

In *Tennille I*, ___ Mich App at ___, slip op at 5, we concluded that defendants met their burden of establishing a prima facie case of discrimination and noted that "the prosecution does not dispute" this point. The prosecution now contends that it never conceded the existence of a prima facie case; rather, the circuit court skipped *Batson*'s first step, denying the prosecution the opportunity to make a challenge on the record. And, the prosecution insists, no prima facie case was made out here.

"Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue whether the defendant had made a prima facie showing becomes moot." *Hernandez v New York*, 500 US 352, 359; 111 S Ct 1859; 114 L Ed 2d 395 (1991). See also *People v Bell*, 473 Mich 275, 296; 702 NW2d 128, mod 474 Mich 1201 (2005). Consequently, whether or not a prima facie case of discrimination existed here has become irrelevant. The prosecution had ample opportunity to question whether defendant established a prima facie case during the colloquy with the court after the jury was selected. Instead, the prosecutor argued that he had not intentionally discriminated. It was too late at that point to challenge *Batson*'s first step, and it is too late now.

B

In *Tennille I*, ___ Mich App ___, slip op at 7, we determined that the prosecutor satisfied the second step of the *Batson* analysis: providing a race-neutral explanation for employing peremptory strikes to remove potential jurors of defendants' race. This still stands true. Anderson testified that he peremptorily challenged WB and DC because their reactions to JG's voir dire answers suggested anti-police sentiment. This explanation is " 'clear and reasonably specific,' " *id*. at ___, slip op at 6, quoting *Batson*, 475 US at 98 n 20, and " 'does not, on its face, discriminate on the basis of race.' " *Tennille I*, ___ Mich App at ___, slip op at 6, quoting *People v Knight*, 473 Mich 324, 344; 701 NW2d 715 (2005). Accordingly, as dictated by *Knight*, 473 Mich at 344, we are bound to conclude that "the explanation passes *Batson* muster."

C

This brings us to the third and final *Batson* step, the step we directed the circuit court to more thoroughly address to allow our review. "Batson's third step requires the trial court to make a final determination of whether the challenger of the strike has established purposeful discrimination." *Tennille I*, ___ Mich App at ___, slip op at 7, citing *Batson*, 476 US at 98. We

-5-

described the standards for reviewing this step in great detail in *Tennille I*, ___ Mich App at ___, slip op at 7-12, and will not repeat them here. Rather, we emphasize that trial courts applying *Batson* must rigorously adhere to the three-step process, and must do so on the record.

We first address our previously cited concern that the circuit court "made no effort to entertain argument from defense counsel regarding whether the strike was racially motivated . . . ." *Id.* at ___, slip op at 9. The appellate prosecutor addressed this concern at the hearing on remand by asking the trial defense attorneys whether they were prevented from making additional argument regarding the *Batson* challenge at trial. McCarthy stated that "[t]hings could have been added," but admitted, "Was there something I wanted to say then and I didn't? No." McCarthy further noted, "[I]f I wanted to say something, I would have spoken up," but he did not "think that there was anything I needed to say." When queried by appellate counsel for defendant Rutledge, McCarthy mused, "[T]his was making a record of something that had occurred earlier in the day. There wasn't going to be any undoing of the exclusion or the removal of either one of those two jurors."

Harris asserted that he no longer recalled "the substance of what we talked about" during the sidebar. Harris conceded that the court did not prevent him "from saying anything" and that he could have argued with the court regarding the substance of the *Batson* denial at that time. But again, Harris indicated that he did not recall whether he attempted to rebut the prosecutor's race-neutral explanation during the sidebar.

When the *Batson* challenge was placed on the record on the second day of the trial proceedings, Harris added nothing to the argument; "At that point, once those jurors were released, I know there wasn't anything I could do other than make a record." Harris developed his answer upon inquiry by the appellate prosecutor:

> *Q*. Okay. And so at the end of the day, the judge placed it on the record, the *Batson* challenge?
>
> *A*. Correct.
>
> *Q*. Okay. And at that time, the judge recited what had occurred at the sidebar?
>
> *A*. Yes.
>
> *Q*. Did the judge leave anything out, or did the judge say anything that was erroneous when she stated what was put on the sidebar?
>
> *A*. I can't say whether she said anything erroneous or not.
>
> *Q*. Okay. And if she had, would you have corrected the judge or said something?
>
> *A*. I would have. I would have objected to her statement, yes.

*Q.* Okay. And in your review of the transcript, you did not make any kind of objection to the judge's recitation as to what happened at the sidebar?

*A.* Correct. But by then, I knew I had already lost the jurors. So I don't know that my comments would have had an effect in terms of recouping those jurors.

*Q.* Okay. So if you - - so you're saying that if there was something you could have said, you decided not to say anything because it was too late?

*A.* No, I'm saying that the position that I was in at that point in time is that I had already lost the jurors. And I think by that time we had already picked a jury. So I had moved on.

But Harris noted that he would have challenged the court had it not made a complete record of what occurred during the sidebar. We remain concerned that the trial court created no contemporaneous record of Harris's *Batson* objection, and remind the trial court that this error has unnecessarily complicated this case, and resulted in the expenditure of an inordinate amount of judicial time.

Our second concern was that the circuit court accepted the trial prosecutor's race-neutral explanation as true without making a finding regarding the prosecutor's credibility. *Id.* at ___, slip op at 9. In its post-hearing opinion, the court described that it found Anderson's explanation credible because it "had also observed the extreme reactions of DC and WB."

Third, we questioned the concern raised by WB's and DC's allegedly extreme reactions to JG's comments. Specifically, "[e]ven if they displayed more pronounced feelings than those revealed by others who shared them, it does not necessarily follow that they would be less disposed than other reacting jurors to accept the prosecutor's proofs." *Id.* at ___, slip op at 10. Anderson, we continued, "offered no explanation for this logical leap." *Id.* At the hearing on remand, Anderson testified that he did not ask the court to direct additional questions at WB and DC to ferret out potential biases. Rather, Anderson relied on his perception of their behavior as reflective of anti-police attitudes.

This flows into our fourth cited concern: that the court "made no factual determination of the jurors' demeanors." *Id.* at ___, slip op at 11. The court remedied this shortfall by describing its observation of WB's and DC's reactions in comparison to that of the other venire members. The courts' perceptions mirrored Anderson's; "These reactions seemed to indicate to both Mr. Anderson and to the Court that these two jurors strongly disagreed with JG's pro-police attitude."

Finally, we cited the "formidable evidentiary gap" left after voir dire. *Id.* at ___, slip op at 12. In *Tennille I*, we held:

Given the passage of time, we are not confident that any of the trial participants will be able to summon actual memories of the facial expressions of the challenged jurors *and* those of the jurors in the venire *and* those seated in the jury box *and* the prosecutor's credibility at the time he argued against the *Batson*

challenge. Additional relevant facts include: the number of minority jurors in the jury box at the time of the strikes, the number of minority jurors on the final jury, [and] the prosecutor's demeanor and credibility at the time he made the strikes. . . . This case presents a formidable evidentiary gap. It remains to be seen whether that gap can be confidently and reliably filled on remand. [*Id.*]

No one was able to provide the number of minority jurors in the box when either WB or DC were struck or describe the specific racial composition of the final jury. Only the prosecutor was certain that some number of African-Americans made the final cut, but even he failed to note the race of any potential juror in his notes. Moreover, only the prosecutor and the court recalled an observable difference between the reactions of WB and DC compared to the other venire members. McCarthy and Harris saw nothing inconsistent in the subject jurors' reactions.

After conducting the hearing on remand, the trial court determined that the prosecutor did not intend to discriminate against the stricken jurors on the basis of race. An assessment of "the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' " *Hernandez*, 500 US at 365 (citations omitted). We must affirm a trial court's credibility finding absent clear error. On this record, we cannot say that the circuit court clearly erred, as defendants have provided us with no basis to override the trial court's credibility finding.

## II. ADDITIONAL APPELLATE CHALLENGES

As a successful *Batson* challenge would have been dispositive, we did not reach the remainder of defendants' appellate arguments in *Tennille I*. We must do so now.

The jury convicted defendants of first-degree murder and felony-firearm for the fatal shooting of Charles Whitfield outside a Detroit gas station in the early hours of June 28, 2012. Defendants were tracked down and identified based on surveillance video footage from the gas station.

### A. IDENTIFICATION OF DEFENDANT RUTLEDGE

Defendant Rutledge contends that the prosecutor presented insufficient evidence to support that he was at the gas station on the night in question and was in involved in the shooting. As such, Rutledge also asserts that his convictions are against the great weight of the evidence.

We review challenges to the sufficiency of the evidence de novo, viewing the evidence "in the light most favorable to the prosecution" to determine whether a rational trier of fact "could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Odom*, 276 Mich App 407, 418; 740 NW2d 557 (2007). In doing so, we must resolve all evidentiary conflicts in the prosecution's favor, *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010), and give special deference to the fact-finder's assessment of witness credibility. *People v Sherman-Huffman*, 241 Mich App 264, 267; 615 NW2d 776 (2000). A verdict is against the great weight of the evidence if "the evidence preponderates so heavily against the verdict" that allowing the verdict to stand "would be a miscarriage of justice." *People v Cameron*, 291 Mich App 599, 617; 806 NW2d 371 (2011). Relief is warranted under

this standard only when the verdict "does not find reasonable support in the evidence, but is more likely attributable to factors outside the record, such as passion, prejudice, sympathy, or other extraneous considerations." *People v Plummer*, 229 Mich App 293, 306; 581 NW2d 753 (2013).

At trial, the prosecution presented the testimony of Turquoise Irvin. Irvin knew defendant Tennille personally, but was less acquainted with Rutledge, who she knew as "Merf." During the investigation, a Detroit police officer showed Irvin still shots from the gas station surveillance footage. Irvin identified Rutledge to the police and in court as one of the individuals in the images. The prosecution also played the surveillance footage for the jury. From this evidence, the jurors could make their own determination whether the man depicted in the video was Rutledge. As the jurors had an opportunity to directly assess the evidence and conclude for themselves that Rutledge appeared in the footage, we may not interfere with the judgment.

In the alternative, Rutledge contends that the circuit court abused its discretion in admitting Irvin's identification testimony, given her lack of familiarity with Rutledge. Rutledge mischaracterizes Irvin's testimony. Irvin knew Rutledge well enough to identify him in a photograph, she simply did not have a "personal" relationship with him. In any event, the introduction of the video footage allowed the jury to make its own assessment, rendering any error in this regard harmless.

## B. IDENTIFICATION OF DEFENDANT TENNILLE

Defendant Tennille challenges the admission of identification testimony from Detroit police sergeant Ron Gibson and his counsel's failure to object on this ground at trial.

Sergeant Gibson heads the police department's video forensics team and the court qualified him without objection as an expert in forensic video analysis and technology. As part of the current investigation, Gibson secured the gas station's surveillance footage and extracted the relevant portions for evidence. This included footage from five separate camera angles. During Gibson's testimony, the prosecutor played these video excerpts for the jury.

Gibson noted that the video was very poor in quality and that he clarified it to the best of his ability. In the video, tattoos can be seen on one of the perpetrator's arms. Gibson secured a search warrant and compared the tattoos depicted in the video to those on Tennille's arms. In doing so, Gibson "found matching placements of tattooing, matching patterns and the placement on the arms." In his investigative report, Gibson noted similarities between the tattoos in the video footage and on Tennille's arms in the "density and position," "script," and general shape. Gibson concluded that the number of similarities between Tennille's tattoos and those of the recorded perpetrator "prevent[ed] this examiner from excluding the known individual [Tennille] from consideration."

We generally review for an abuse of discretion a trial court's decision whether to admit expert witness testimony. *Rock v Crocker*, 499 Mich 247, 255; 884 NW2d 227 (2016). Where, as here, the defense does not object to the evidence's admission, our review is limited to plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Tennille contends that trial counsel was ineffective for failing to object in order to preserve this challenge. Because Tennille failed to challenge counsel's performance below, our review is limited to mistakes apparent on the existing record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). To establish ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant that he was denied the right to a fair trial. *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994). The defendant must overcome the presumption that the challenged action was sound trial strategy. *People v Tommolino*, 187 Mich App 14, 17; 466 NW2d 315 (1991). To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *People v Johnson*, 451 Mich 115, 124; 545 NW2d 637 (1996). But "[t]his Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999).

Tennille asserts that Gibson's testimony comparing the perpetrator in still photographs taken from the surveillance video to photographs of Tennille's tattoos to identify him as one of the perpetrators improperly invaded the province of the jury. In a case involving the same police witness now at issue, this Court determined that although qualified as an expert, the particular comparison testimony amounted to a lay opinion. *People v Fromby*, 300 Mich App 46, 50; 831 NW2d 887 (2013). This Court determined that Gibson's testimony in that case did not invade the province of the jury because "Gibson did not identify defendant in the video or still images." Rather, Gibson "only linked individuals depicted in the surveillance video as being the same individuals depicted in the still photographs" presented into evidence. *Id*. at 52-53. As Gibson created the still frames in *Fromby* from the video footage, he "was in the best position" to connect the photographic and video images. *Id*. at 53.

The testimony in this case was qualitatively different from that in *Fromby*. Gibson was asked to compare the still frame images he extracted from the video to a defendant in the courtroom. This " 'was a determination properly left to the jury.' " *Id*. at 52, quoting *United States v LaPierre*, 998 F2d 1460, 1465 (CA 9, 1993). As further discussed in *United States v Rodríguez-Adorno*, 695 F3d 32, 40 (CA 1, 2012), which is also cited in *Fromby*:

> Testimony by a law enforcement officer identifying a defendant as the person depicted in a video or photograph may be admissible where "the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the [images] are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification." However, where the witness is in no better position than the jury to make an identification, such testimony does not meet the requirements of Federal Rule of Evidence 701 and is inadmissible. [Citation omitted.]

"[T]he use of lay opinion identification by policemen or parole officers is not to be encouraged, and should be used only if no other adequate identification testimony is available to the prosecution." *United States v Butcher*, 557 F2d 666, 670 (CA 9, 1977).

-10-

The jury in this case was presented with video of admittedly poor quality. There is no record suggestion that Gibson had any special familiarity with Tennille such that his identification was "better-suited" than that of the jurors. Although Gibson did not definitively identify Tennille as a perpetrator in the surveillance video, the testimony did invade the province of the jury. Gibson was in no better position than the jury to compare the perpetrator's tattoos as depicted in the video to those of Tennille who was seated in the courtroom. This consideration should have been left to the jury.

While the admission of Gibson's testimony was improper, it was not prejudicial. Gibson's testimony was not definitive regarding Tennille's identification as the perpetrator; he merely stated that Tennille could not be eliminated as a suspect. Moreover, other individuals identified Tennille from the still frames. Tennille's mother stated with 100% certainty that one of the still photographs depicted her son and with some certainty that he was depicted in another. Irvin also identified Tennille as one of the individuals depicted based on her personal familiarity with Tennille. Accordingly, relief is unwarranted.

We affirm.


/s/ Douglas B. Shapiro
/s/ Peter D. O'Connell
/s/ Elizabeth L. Gleicher

-11-