Justice Auto
delivered the opinion of the Court.
Petitioner Allen Snyder was convicted of first-degree murder in a Louisiana court and was sentenced to death. He asks us to review a decision of the Louisiana Supreme Court rejecting his claim that the prosecution exercised some of its peremptory jury challenges based on race, in violation of Batson v. Kentucky, 476 U. S. 79 (1986). We hold that the trial court committed clear error in its ruling on a Batson objection, and we therefore reverse.
I
The crime for which petitioner was convicted occurred in August 1995. At that time, petitioner and his wife, Mary, had separated. On August 15, they discussed the possibility of reconciliation, and Mary agreed to meet with petitioner the next day. That night, Mary went on a date with Howard Wilson. During the evening, petitioner repeatedly attempted to page Mary, but she did not respond. At approximately 1:30 a.m. on August 16, Wilson drove up to the home of Mary’s mother to drop Mary off. Petitioner was waiting at the scene armed with a knife. He opened the driver’s side door of Wilson’s car and repeatedly stabbed the occu *475 pants, killing Wilson and wounding Mary. The State charged petitioner with first-degree murder and sought the death penalty based on the aggravating circumstance that petitioner had knowingly created a risk of death or great bodily harm to more than one person. See La. Code Crim. Proc. Ann., Art. 905.4(A)(4) (West Supp. 2008).
Voir, dire began on Tuesday, August 27, 1996, and proceeded as follows. During the first phase, the trial court screened the panel to identify jurors who did not meet Louisiana’s requirements for jury service or claimed that service on the jury or sequestration for the duration of the trial would result in extreme hardship. More than 50 prospective jurors reported that they had work, family, or other commitments that would interfere with jury service. In each of those instances, the nature of the conflicting commitments was explored, and some of these jurors were dismissed. App. 58-164.
In the next phase, the court randomly selected panels of 13 potential jurors for further questioning. Id., at 166-167. The defense and prosecution addressed each panel and questioned the jurors both as a group and individually. At the conclusion of this questioning, the court ruled on challenges for cause. Then, the prosecution and the defense were given the opportunity to use peremptory challenges (each side had 12) to remove remaining jurors. The court continued this process' of calling 13-person panels until the jury was filled. In accordance with Louisiana law, the parties were permitted to exercise “backstrikes.” That is, they were allowed to use their peremptories up until the time when the final jury was sworn and thus were permitted to strike jurors whom they had initially accepted when the jurors’ panels were called. See La. Code Crim. Proc. Ann., Art. 795(B)(1) (West 1998); State v. Taylor, 93-2201, pp. 22-23 (La. 2/28/96), 669 So. 2d 364, 376.
Eighty-five prospective jurors were questioned as members of a panel. Thirty-six of these survived challenges for *476 cause; 5 of the 36 were black (as is petitioner); and all 5 of the prospective black jurors were eliminated by the prosecution through the use of peremptory strikes. The jury found petitioner guilty of first-degree murder and determined that he should receive the death penalty.
On direct appeal, the Louisiana Supreme Court conditionally affirmed petitioner’s conviction. The court rejected petitioner’s Batson claim but remanded the case for a nunc pro tunc determination of petitioner’s competency to stand trial. State v. Snyder, 98-1078 (La. 4/14/99), 750 So. 2d 832. Two justices dissented and would have found a Batson violation. See id., at 866 (Johnson, J., dissenting), 863 (Lemmon, J., concurring in part and dissenting in part).
On remand, the trial court found that petitioner had been competent to stand trial, and the Louisiana Supreme Court affirmed that determination. State v. Snyder, 1998-1078 (La. 4/14/04), 874 So. 2d 739. Petitioner petitioned this Court for a writ of certiorari, and while his petition was pending, this Court decided Miller-El v. Dretke, 545 U. S. 231 (2005). We then granted the petition, vacated the judgment, and remanded the case to the Louisiana Supreme Court for further consideration in light of Miller-El. Snyder v. Louisiana, 545 U. S. 1137 (2005). On remand, the Louisiana Supreme Court again rejected Snyder’s Batson claim, this time by a vote of 4 to 3. See 1998-1078 (La. 9/6/06), 942 So. 2d 484. We again granted certiorari, 551 U. S. 1144 (2007), and now reverse.
II
Batson provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race:
“ ‘First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; sjecond, if that showing has been made, *477 the prosecution must offer a race-neutral basis for striking the juror in question!; and t]hird, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination.’” Miller-El v. Dretke, supra, at 277 (Thomas, J., dissenting) (quoting Miller-El v. Cockrell, 537 U. S. 322, 328-329 (2003)).
On appeal, a trial court’s ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. See Hernandez v. New York, 500 U. S. 352, 369 (1991) (plurality opinion); id., at 372 (O’Connor, J., joined by Scalia, J., concurring in judgment). The trial court has a pivotal role in evaluating Batson claims. Step three of the Batson inquiry involves an evaluation of the prosecutor’s credibility, see 476 U. S., at 98, n. 21, and “the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge,” Hernandez, 500 U. S., at 365 (plurality opinion). In addition, race-neutral reasons for peremptory challenges often invoke a juror’s demeanor (e. g., nervousness, inattention), making the trial court’s firsthand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor’s demeanor belies a discriminatory intent, but also whether the juror’s demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie “‘peculiarly within a trial judge’s province,’ ” ibid, (quoting Wainwright v. Witt, 469 U. S. 412, 428 (1985)), and we have stated that “in the absence of exceptional circumstances, we would defer to [the trial court],” 500 U. S., at 366 (plurality opinion).
III
Petitioner centers his Batson claim on the prosecution’s strikes of two black jurors, Jeffrey Brooks and Elaine Scott.
*478 Because we find that the trial court committed clear error in overruling petitioner’s Batson objection with respect to Mr. Brooks, we have no need to consider petitioner’s claim regarding Ms. Scott. See, e.g., United States v. Vasquez-Lopez, 22 F. 3d 900, 902 (CA9 1994) (“[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose”); United States v. Lane, 866 F. 2d 103, 105 (CA4 1989); United States v. Clemons, 843 F. 2d 741, 747 (CA3 1988); United States v. Battle, 836 F. 2d 1084, 1086 (CA8 1987); United States v. David, 803 F. 2d 1567, 1571 (CA11 1986).
In Miller-El v. Dretke, the Court made it clear that in considering a Batson objection, or in reviewing a ruling claimed to be Batson error, all of the circumstances that bear upon the issue of racial animosity must be consulted. 545 U. S., at 239. Here, as just one example, if there were persisting doubts as to the outcome, a court would be required to consider the strike of Ms. Scott for the bearing it might have upon the strike of Mr. Brooks. In this case, however, the explanation given for the strike of Mr. Brooks is by itself unconvincing and suffices for the determination that there was Batson error.
When defense counsel made a Batson objection concerning the strike of Mr. Brooks, a college senior who was attempting to fulfill his student-teaching obligation, the prosecution offered two race-neutral reasons for the strike. The prosecutor explained:
“I thought about it last night. Number 1, the main reason is that he looked very nervous to me throughout the questioning. Number 2, he’s one of the fellows that came up at the beginning [of voir dire] and said he was going to miss class. He’s a student teacher. My main concern is for that reason, that being that he might, to go home quickly, come back with guilty of a lesser verdict so there wouldn’t be a penalty phase. Those are my two reasons.” App. 444.
*479 Defense counsel disputed both explanations, id., at 444-445, and the trial judge ruled as follows: “All right. I’m going [to] allow the challenge. I’m going to allow the challenge,” id., at 445. We discuss the prosecution’s two proffered grounds for striking Mr. Brooks in turn.
A
With respect to the first reason, the Louisiana Supreme Court was correct that “nervousness cannot be shown from a cold transcript, which is why .. . the [trial] judge’s evaluation must be given much deference.” 942 So. 2d, at 496. As noted above, deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike. Here, however, the record does not show that the trial judge actually made a determination concerning Mr. Brooks’ demeanor. The trial judge was given two explanations for the strike. Rather than making a specific finding on the record concerning Mr. Brooks’ demeanor, the trial judge simply allowed the challenge without explanation. It is possible that the judge did not have any impression one way or the other concerning Mr. Brooks’ demeanor. Mr. Brooks was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned. Thus, the trial judge may not have recalled Mr. Brooks’ demeanor. Or, the trial judge may have found it unnecessary to consider Mr. Brooks’ demeanor, instead basing his ruling completely on the second proffered justification for the strike. For these reasons, we cannot presume that the trial judge credited the prosecutor’s assertion that Mr. Brooks was nervous.
B
The second reason proffered for the strike of Mr. Brooks— his student-teaching obligation — fails even under the highly deferential standard of review that is applicable here. At the beginning of voir dire, when the trial court asked the *480 • members of the venire whether jury service or sequestration would pose an extreme hardship, Mr. Brooks was 1 of more than 50 members of the venire who expressed concern that jury service or sequestration would interfere with work, school, family, or other obligations.
When Mr. Brooks came forward, the following exchange took place:
“MR. JEFFREY BROOKS: ... I’m a student at Southern University, New Orleans. This is my last semester. My major requires me to student teach, and today I’ve already missed a half a day. That is part of my — it’s required for me to graduate this semester.
“[DEFENSE COUNSEL]: Mr. Brooks, if you — how many days would you miss if you were sequestered on this jury? Do you teach every day?
“MR. JEFFREY BROOKS: Five days a week.
“[DEFENSE COUNSEL]: Five days a week.
“MR. JEFFREY BROOKS: And it’s 8:30 through 3:00.
“[DEFENSE COUNSEL]: If you missed this week, is there any way that you could make it up this semester?
“MR. JEFFREY BROOKS: Well, the first two weeks I observe, the remaining I begin teaching, so there is something I’m missing right now that will better me towards my teaching career.
“[DEFENSE COUNSEL]: Is there any way that you could make up the observed observation [sic] that you’re missing today, at another time?
“MR. JEFFREY BROOKS: It may be possible, I’m not sure.
“[DEFENSE COUNSEL]: Okay. So that—
“THE COURT: Is there anyone we could call, like a Dean or anything, that we could speak to?
“MR: JEFFREY BROOKS: Actually I spoke to my Dean, Doctor Tillman, who’s at the university probably right now.
“THE COURT: All right.
*481 “MR. JEFFREY BROOKS: Would you like to speak to him?
“THE COURT: Yeah.
“MR. JEFFREY BROOKS: I don’t have his card on me.
“THE COURT: Why don’t you give [a law clerk] his number, give [a law clerk] his name and we’ll call him and we’ll see what we can do.
“(MR. JEFFREY BROOKS LEFT THE BENCH).” App. 102-104.
Shortly thereafter, the court again spoke with Mr. Brooks:
“THE LAW CLERK: Jeffrey Brooks, the requirement for his teaching is a three hundred clock hour observation. Doctor Tillman at Southern University said that as long as it’s just this week, he doesn’t see that it would cause a problem with Mr. Brooks completing his observation time within this semester.
“(MR. BROOKS APPROACHED THE BENCH)
“THE COURT: We talked to Doctor Tillman and he says he doesn’t see a problem as long as it’s just this week, you know, he’ll work with you on it. Okay?
“MR. JEFFREY BROOKS: Okay.
“(MR. JEFFREY BROOKS LEFT THE BENCH).” Id., at 116.
Once Mr. Brooks heard the law clerk’s report about the conversation with Doctor Tillman, Mr. Brooks did not express any further concern about serving on the jury, and the prosecution did not choose to question him more deeply about this matter.
The colloquy with Mr. Brooks and the law clerk’s report took place on Tuesday, August 27; the prosecution struck Mr. Brooks the following day, Wednesday, August 28; the guilt phase of petitioner’s trial ended the next day, Thursday, August 29; and the penalty phase was completed by the end of the week, on Friday, August 30.
*482 The prosecutor’s second proffered reason for striking Mr. Brooks must be evaluated in light of these circumstances. The prosecutor claimed to be apprehensive that Mr. Brooks, in order to minimize the student-teaching hours missed during jury service, might have been motivated to find petitioner guilty, not of first-degree murder, but of a lesser included offense because this would obviate the need for a penalty phase proceeding. But this scenario was highly speculative. Even if Mr. Brooks had favored a quick resolution, that would not have necessarily led him to reject a finding of first-degree murder. If the majority of jurors had initially favored a finding of first-degree murder, Mr. Brooks’ purported inclination might have led him to agree in order to speed the deliberations. Only if all or most of the other jurors had favored the lesser verdict would Mr. Brooks have been in a position to shorten the trial by favoring such a verdict.
.Perhaps most telling, the brevity of petitioner’s trial— something that the prosecutor anticipated on the record during voir dire[1] — meant that serving on the jury would not have seriously interfered with Mr. Brooks’ ability to complete his required student teaching. As noted, petitioner’s trial was completed by Friday, August 30. If Mr. Brooks, who reported to court and was peremptorily challenged on Wednesday, August 28, had been permitted to serve, he would have missed only two additional days of student teaching, Thursday, August 29, and Friday, August 30. Mr. Brooks’ dean promised to “work with” Mr. Brooks to see that he was able to make up any student-teaching time that he missed due to jury service; the dean stated that he did not think that this would be a problem; and the record contains no suggestion that Mr. Brooks remained troubled after hearing the report of the dean’s remarks. In addition, although the record does not include the academic calendar of *483 Mr. Brooks’ university, it is apparent that the trial occurred relatively early in the fall semester. With many weeks remaining in the term, Mr. Brooks would have needed to make up no more than an hour or two per week in order to compensate for the time that he would have lost due to jury service. When all of these considerations are taken into account, the prosecutor’s second proffered justification for striking Mr. Brooks is suspicious.
The implausibility of this explanation is reinforced by the prosecutor’s acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as Mr. Brooks’. We recognize that a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable. In this case, however, the shared characteristic, i. e., concern about serving on the jury due to conflicting obligations, was thoroughly explored by the trial court when the relevant jurors asked to be excused for cause.[2]
A comparison between Mr. Brooks and Roland Laws, a white juror, is particularly striking. During the initial stage of voir dire, Mr. Laws approached the court and offered strong reasons why serving on the sequestered jury would cause him hardship. Mr. Laws stated that he was “a self-employed general contractor,” with “two houses that are nearing completion, one [with the occupants] . . . moving in this weekend.” Id., at 129. He explained that, if he served on the jury, “the people won’t [be able to] move *484 in.” Id., at 130. Mr. Laws also had demanding family obligations:
“[M]y wife just had a hysterectomy, so I’m running the kids back and forth to school, and we’re not originally from here, so I have no family in the area, so between the two things, it’s kind of bad timing for me.” Ibid.
Although these obligations seem substantially more pressing than Mr. Brooks’, the prosecution questioned Mr. Laws and attempted to elicit assurances that he would be able to serve despite his work and family obligations. See ibid, (prosecutor asking Mr. Laws “[i]f you got stuck on jury duty anyway . . . would you try to make other arrangements as best you could?”). And the prosecution declined the opportunity to use a peremptory strike on Mr. Laws. Id., at 549. If the prosecution had been sincerely concerned that Mr. Brooks would favor a lesser verdict than first-degree murder in order to shorten the trial, it is hard to see why the prosecution would not have had at least as much concern regarding Mr. Laws.
The situation regarding another white juror, John Donnes, although less fully developed, is also significant. At the end of the first day of voir dire, Mr. Donnes approached the court and raised the possibility that he would have an important work commitment later that week. Id., at 349. Because Mr. Donnes stated that he would know the next morning whether he would actually have a problem, the court suggested that Mr. Donnes raise the matter again at that time. Ibid. The next day, Mr. Donnes again expressed concern about serving, stating that, in order to serve, “I’d have to cancel too many things,” including an urgent appointment at which his presence was essential. Id., at 467-468. Despite Mr. Donnes’ concern, the prosecution did not strike him. Id., at 490.
As previously noted, the question presented at the third stage of the Batson inquiry is “ ‘whether the defendant has *485 shown purposeful discrimination.’” Müler-El v. Dretke, 545 U. S., at 277 (Thomas, J., dissenting). The prosecution’s proffer of this pretextual explanation naturally gives rise to an inference of discriminatory intent. See id., at 252 (opinion of the Court) (noting the “pretextual significance” of a “stated reason [that] does not hold up”); Purkett v. Elem, 514 U. S. 765, 768 (1995) (per curiam) (“At [the third] stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination”); Hernandez, 500 U. S., at 365 (plurality opinion) (“In the typical peremptory challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed”). Cf. St. Mary’s Honor Center v. Hicks, 509 U. S. 502, 511 (1993) (“[Rejection of the defendant’s proffered [nondiscriminatory] reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination”).
In other circumstances, we have held that, once it is shown that a discriminatory intent was a substantial or motivating factor in an action taken by a state actor, the burden shifts to the party defending the action to show that this factor was not determinative. See Hunter v. Underwood, 471 U. S. 222, 228 (1985). We have not previously applied this rule in a Batson case, and we need not decide here whether that standard governs in this context. For present purposes, it is enough to recognize that a peremptory strike shown to have been motivated in substantial part by discriminatory intent could not be sustained based on any lesser showing by the prosecution. And in light of the circumstances here— including absence of anything in the record showing that the trial judge credited the claim that Mr. Brooks was nervous, the prosecution’s description of both of its proffered explanations as “main concern[s],” App. 444, and the adverse inference noted above — the record does not show that the prosecution would have pre-emptively challenged Mr. Brooks based on his nervousness alone. See Hunter, supra, at 228.
*486 Nor is there any realistic possibility that this subtle question of causation could be profitably explored further on remand at this late date, more than a decade after petitioner’s trial.
We therefore reverse the judgment of the Louisiana Supreme Court and remand the case for further proceedings not inconsistent with this opinion.

It is so ordered.

See, e. g., App. 98,105, 111, 121,130, 204.

 The Louisiana Supreme Court did not hold that petitioner had procedurally defaulted reliance on a comparison of the African-American jurors whom the prosecution struck with white jurors whom the prosecution accepted. On the contrary, the State Supreme Court itself made such a comparison. See 942 So. 2d 484, 495-496 (2006).