FILED
United States Court of Appeals
Tenth Circuit

January 9, 2017

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
————————————————

MARCUS WASHINGTON,

    Petitioner - Appellant,

v.

No. 15-3097

RAYMOND ROBERTS; DEREK
SCHMIDT, Attorney General of the State
of Kansas,

    Respondents - Appellees.

————————————————

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 5:11-CV-03045-SAC)**
————————————————

Melody Brannon, Office of the Federal Public Defender, Topeka, Kansas, for Petitioner-
Appellant.

Kristafer R. Ailslieger, Topeka, Kansas, for Respondents-Appellees.
————————————————

Before **HARTZ**, **BACHARACH**, and **McHUGH**, Circuit Judges.
————————————————

**HARTZ**, Circuit Judge.
————————————————

    Marcus Washington seeks to set aside his state-court murder conviction. We

granted a certificate of appealability (COA) so that he could appeal the denial of four

claims raised in his application for relief under 28 U.S.C. § 2254. *See* 28 U.S.C. 2253(c)(1)(A) (requiring COA to appeal denial of relief under § 2254). These claims are: (1) the State exercised peremptory jury challenges against African Americans in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986); (2) his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), were violated by the use of statements he made while in custody; (3) his trial attorney was ineffective in not calling him as a witness on the *Miranda* issue to show that he was in custody; and (4) the prosecutor's closing argument improperly challenged his mental-disease defense. The United States District Court for the District of Kansas rejected Mr. Washington's claims and dismissed his petition. Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we affirm.

## I.    BACKGROUND

Mr. Washington was convicted by a Kansas jury on one count of first-degree premeditated murder and one count of criminal possession of a firearm arising out of the January 16, 2000 shooting of Stacey Quinn. He was sentenced on the murder conviction to life without the possibility of parole for 50 years and to a concurrent lesser term on the firearm conviction.

On direct appeal the Kansas Supreme Court affirmed the convictions but remanded to the trial court for resentencing. *See State v. Washington*, 68 P.3d 134 (Kan. 2003). The trial court reimposed the original sentence. Mr. Washington unsuccessfully appealed, *see State v. Washington*, 123 P.3d 1265 (Kan. 2005), and the United States Supreme Court denied a petition for certiorari, *see* 549 U.S. 1018 (2006).

## II.    STANDARD OF REVIEW

We review § 2254 applications under the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  A petitioner is entitled to relief if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). "Clearly established law is determined by the United States Supreme Court, and refers to the Court's holdings, as opposed to the dicta." *Lockett v. Trammel*, 711 F.3d 1218, 1231 (10th Cir. 2013) (internal quotation marks omitted).  Only Supreme Court law announced by the time of the state-court decision on the merits qualifies as "clearly established law." *See Greene v. Fisher*, 132 S. Ct. 38, 42, 44 (2011).  A state court's decision is "contrary to" clearly established law if the state court reaches a conclusion "opposite to that reached by the Supreme Court on a question of law" or "decides a case differently than the Court has . . . on materially indistinguishable facts." *Dodd v. Trammell*, 753 F.3d 971, 982 (10th Cir. 2013) (brackets and internal quotation marks omitted).  A state court's decision is an "unreasonable application" of Supreme Court law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (internal quotation marks omitted).

## III.    *BATSON* CLAIM

In *Batson v. Kentucky*, 476 U.S. 79, 84 (1986), the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment forbids the

3

purposeful exclusion of a potential juror on account of race. It created a three-step framework to determine whether a peremptory strike was impermissible. First, the defendant must make a prima facie case of discrimination by presenting evidence supporting an inference that the prosecutor exercised the peremptory challenge to exclude a potential juror on the basis of race. *See id.* at 96–97. If the defendant makes this showing, the burden shifts to the prosecution to provide a race-neutral justification for the strike. *See id.* at 97–98. If the prosecution does so, the court must determine whether purposeful discrimination occurred. *See id.* at 98.

Our resolution of Mr. Washington's claim is highly dependent on the standard of review required by AEDPA. If we were to review the same claim on direct appeal from a federal conviction, reversal would be likely because of the record evidence that at least one peremptory challenge was substantially motivated by race. *See Snyder v. Louisiana*, 552 U.S. 472, 485 (2008) (if "a peremptory strike [is] shown to have been motivated in substantial part by discriminatory intent," then the strike can be sustained only by a showing that the factor was not determinative, and even such a showing may not suffice). But under AEDPA our role is quite limited. We proceed to describe the relevant proceedings at trial and on appeal, determine what standard was applied by the Kansas Supreme Court to resolve the *Batson* issue, analyze whether that standard was contrary to clearly established United States Supreme Court precedent, and then determine whether the standard was unreasonably applied. We will conclude as follows: The test applied by the Kansas Supreme Court forbids only peremptory challenges that are *solely* on account of race. That test was not contrary to clearly established United States Supreme Court

4

precedent when the Kansas court ruled. And we cannot say that this test was unreasonably applied because the Kansas courts reasonably found that each peremptory strike was supported by a nonracial justification.

## A. The Voir Dire

At Mr. Washington's trial the prosecutor used 10 of her 12 peremptory strikes to exclude African American prospective jurors. The jury ultimately was comprised of two African Americans, one Asian American, one Native American, and eight whites. After jury selection Mr. Washington raised a *Batson* challenge. In this court he has questioned the striking of five African American members of the jury panel: Ms. Spratt, Ms. Hodges, Ms. Bullock, Mr. Brantley, and Ms. Powers.

Ms. Spratt and Ms. Hodges both reported in their jury questionnaires that they had previously served as jurors in criminal cases. The prosecutor first questioned Ms. Spratt:

> *Prosecutor*: . . . You indicated you had been on a criminal case.
> *Ms. Spratt*: Yes.
> *Prosecutor*: What kind of case was that and when was that?
> *Ms. Spratt*: Goodness, it's been about five or six years ago, maybe even longer.
> *Prosecutor*: Do you remember what the case was about?
> *Ms. Spratt*: Vaguely. It was—I don't know what you would describe it as I guess a young man and lady got into an argument at a gas station and it ended up being criminal because she said he took jewelry from her.
> *Prosecutor*: Was that some kind of domestic where they knew each other or theft where he took stuff from her?
> *Ms. Spratt*: It was like they knew each other and like she hit his car and he took her necklace for the value for her getting his car or something like that.

Tr. of Jury Voir Dire at 176–77. The prosecutor then turned to Ms. Hodges:

> *Prosecutor*: Ms. Hodges, what kind of criminal case were you on?
> *Ms. Hodges*: Let's see. It's been awhile. It was a shooting case.
> *Prosecutor*: It wasn't a homicide then?
> *Ms. Hodges*: No, it was not.

5

> *Prosecutor*:   How long ago was that?
> *Ms. Hodges*:   It's been probably 15 or so.

*Id.* at 177.

After Mr. Washington raised his *Batson* objection at the conclusion of voir dire, the court asked the prosecutor to explain the strikes. She started with the same explanation for Ms. Spratt and Ms. Hodges: "[O]ne of the questions I asked was for them to describe the criminal case that they were previously on. And actually both [Ms. Spratt] and . . . Ms. Hodges . . . were quite evasive on what kind of case that was and the fact they seemed to have a hard time remembering or understanding the concept of what that case was about." *Id.* at 224. She then continued with respect to Ms. Spratt: "Additionally, Judge, another reason I struck Ms. Spratt is because she lives in the projects and there is a lot of homicides that happen down in the projects. And so I struck her also for that reason." *Id.* Defense counsel said, " I object as—," but the judge asked the prosecutor to proceed with her explanations for striking the other jurors. *Id.*

The prosecutor said that she struck Ms. Bullock because she incorrectly filled out her jury questionnaire, suggesting that she could not follow directions. She said that Ms. Bullock indicated on the questionnaire that she was single, but later provided her spouse's employment information. *See id.* at 226. The prosecutor also noted that Ms. Bullock listed the names of her children and omitted their ages, whereas the form called for their ages only, not their names. *See id.*

As for Mr. Brantley, he stated during jury selection that a close friend of his had been murdered. When defense counsel asked whether he had known anyone to carry a

gun for protection, he replied, "Yes. They hear that someone is after them or they feel there is a reason for them to carry a gun." *Id.* at 214. Mr. Brantley also said that he had two daughters to take care of, but that they would be okay without him if he were to be empaneled. In explaining her strike of Mr. Brantley, the prosecutor expressed concern that he would sympathize with someone who said he needed to carry a gun for protection, which was part of the theory of Mr. Washington's defense. The prosecutor also cited Mr. Brantley's responsibility for his young children.

Finally the prosecutor explained her strike of Ms. Powers, saying: "[S]he's the high school student. I struck her primarily because of how young she is. She is just 18. She hasn't gotten out of school. She obviously doesn't have a lot of life experiences to draw upon." *Id.* at 227–28.

After the prosecutor completed her explanations, the proceeding concluded as follows:

> *Court:* All right. Obviously, in regard to . . . Mr. Brantley . . . and Ms. Powers, I'm not surprised by those strikes. As to [Ms. Spratt], [Ms. Hodges] . . . and [Ms. Bullock], those are individuals who didn't—well, Ms. Spratt did answer some questions. The others were based on the jury questionnaires. Even though we are now to two African American jurors here, we started out, I think, after strikes for causes—as clear as I can tell, it was about 25 percent so we're about half that in terms of down below that in terms of percentage remaining on this jury. But I can't find that those are racially based strikes based upon the explanation given by the state.
> *Defense Counsel:* Your Honor, striking somebody because they live in the projects—
> *Prosecutor:* That was one reason, Judge. The other reason was her response—
> *Court:* She indicated two reasons. One was as to the prior jury duty. I agree with you, Mr. Coggs [defense counsel]. I don't—

*Id.* at 228. Defense counsel did not pursue the matter further but turned to another juror:

7

> *Defense counsel*: Well, Ms. Powers was asked her age. She is 18. She is an eligible voter. She has life experiences.
> *Court*: I understand, but there was a request to have her struck for cause because of tests she was on. I don't think she is struck because of her race. If she is 18, she is a young juror and it may be the state doesn't want her on there. But I don't think it's race related.
> *Defense counsel*: It's race related when you take it all into consideration that all ten of the twelve strikes are black.
> *Court*: I understand that. I'm going to deny your objection to the jury.

*Id.* at 229.

## B. The Appeal

On appeal to the Kansas Supreme Court, Mr. Washington challenged the exercise of peremptory strikes under *Batson* and also under "the Equal Protection Clause of the Kansas Constitution [, which] affords greater rights [than] the federal Constitution," Kan. Sup. Ct. Aplt. Br. at 29, a state-law claim not reviewable under § 2254. In his counsel's view, "[T]he *Batson* bar [had] fallen so low that even a snake [could] easily slither over it," but even so, "the reason given for a peremptory strike must still be facially valid." *Id.* His *Batson* challenge focused only on the peremptory strike of Ms. Spratt and the strike of another juror not the subject of a challenge on this appeal. Regarding Ms. Spratt, he asserted: "[T]he prosecutor stated that Ms. Spratt was evasive about her prior jury service. The record, to the contrary, shows that Ms. Spratt was quite specific about that service." *Id.* at 33. He then stated that the only remaining reason for the strike was that she lived in the projects, which, he argued, was a surrogate for racial stereotyping.[1]

---

[1] The ground for Mr. Washington's perfunctory *Batson* challenge in the Kansas Supreme Court was a mere shadow of the arguments he now makes before this court. While his brief here argues that the state supreme court erred in permitting the strikes of five

The Kansas Supreme Court affirmed.  After reviewing the peremptory strikes of six members of the jury venire, it concluded that "the trial court did not err in determining that the State provided facially valid race-neutral explanations for striking the six African–Americans." *Washington*, 68 P.3d at 147.  Regarding Spratt, it said that it did not need to consider "the prosecutor's remarks concerning [her] residence," because the prosecutor's other explanation was "a facially valid, race-neutral reason." *Id.*

## C. The Law Applied by the Kansas Supreme Court

Mr. Washington contends that "[d]espite substantial evidence that the prosecutor's explanations were pretext for racial discrimination, the Kansas Supreme Court rejected [his] appeal by ignoring salient evidence of pretext and by misapplying *Batson*."  Petr's Suppl. Br. at 1.  He says that the Kansas Supreme Court stopped its analysis at *Batson*'s second step (the prosecution presented a facially valid race-neutral explanation) and never addressed the third and final step (whether that explanation was pretextual).  *See id.* at 17.  And he further contends that the state high court erred in thinking that the

African American jurors because it misapplied step three of the *Batson* test, his state-court brief raised a *Batson* challenge to only one of those five jurors and argued only that the prosecutor's proffered reason for striking the juror did not satisfy *step two* of the *Batson* test.  These omissions in Mr. Washington's Kansas Supreme Court brief may well constitute a failure to exhaust much, if not all, of his § 2254 *Batson* claim.  *See* 28 U.S.C. § 2254(b)(1)(A) (relief cannot be granted unless state prisoner "has exhausted the remedies available in the courts of the State").  The State, however, has not raised failure to exhaust as a defense; and even though we doubt that it has waived the issue, *see id.* § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."); *United States v. Mitchell*, 518 F.3d 740, 746 n.8 (10th Cir. 2008) ("*Sua sponte* consideration of exhaustion of state remedies . . .  is explicitly permitted by Supreme Court precedent."), we choose not to address exhaustion because we can affirm on other grounds.

9

prosecutor needed only to give one acceptable explanation for each juror. Relying on a recent Ninth Circuit decision, he describes the *Batson* doctrine as follows: "It does not matter whether the prosecutor might have some valid race-neutral explanation; the 'defendant need not prove that all the prosecutor's race-neutral reasons were pretextual, or even that the racial motivation was determinative. Instead, to prove a *Batson* violation, the defendant must demonstrate that race was a substantial motivating factor in the prosecutor's use of the peremptory strike.'" *Id.* at 8 (quoting *Currie v. McDowell*, 825 F.3d 603, 605–06 (9th Cir. 2016) (ellipsis omitted)).

The argument has force. As we have already said, we would likely reverse if we were considering this matter on direct appeal from a federal conviction. But Mr. Washington inaccurately describes the analysis of the Kansas Supreme Court (and trial court) and ignores that we must assess the state court's decision in light of preceding clear holdings by the United States Supreme Court. We first describe *Batson* doctrine in Kansas at the time of Mr. Washington's appeal, then determine that it was not an unreasonable construction of Supreme Court precedent, and finally conclude that it was in fact reasonably applied in his appeal.

To begin with, when the Kansas Supreme Court decided Washington's appeal in May 2003, it had not adopted the *Batson* standard expressed by the Ninth Circuit in *Currie*. The Ninth Circuit held that "[t]he defendant need not prove that all the prosecutor's race-neutral reasons were pretextual." *Currie*, 825 F.3d at 605–06. But the Kansas Supreme Court had repeatedly stated that *Batson* was violated only when a racial ground was the *sole* reason for exercising a peremptory strike. *See, e.g.*, *State v. Betts*, 33

10

P.3d 575, 595 (Kan. 2001) ("[T]he Equal Protection Clause forbids the challenging of potential jurors *solely* on account of race or on the assumption that the jurors of that race as a group will be unable to impartially consider the case." (emphasis added)), *overruled on other grounds by State v. Davis*, 158 P.3d 317, 322 (Kan. 2006); *State v. Lee*, 948 P.2d 641, 650 (Kan. 1997) ("After hearing the State's explanations, and having observed the entire voir dire process, the trial court, under *Batson*, is to make a purely factual determination: Has the prosecution *purposefully* discriminated by exercising peremptory challenges against persons *solely on account of their race*?" (emphasis added to final phrase) (internal quotation marks omitted)), *overruled on other grounds by State v. Gunby*, 144 P.3d 647 (Kan. 2006)); *State v. Walston*, 886 P.2d 349, 353 (Kan. 1994) (same). Indeed, in raising his *Batson* objection at trial, defense counsel stated the test in the same terms: "Of the twelve strikes, I believe ten of them were black persons. I could see a couple of them for reasonable cause, but the others I believe were *solely* based on their race." Tr. of Jury Voir Dire at 223. And nothing in counsel's brief to the Kansas Supreme Court suggests a different view of what *Batson* requires.

We agree with Mr. Washington that the Kansas standard at that time does not state current law. A prosecutor who provides a racial ground (or who provides a nonracial ground that is found to be pretextual) when exercising a peremptory strike cannot avoid *Batson* simply by providing an additional nonpretextual, nonracial ground. But that was not clear in 2003. We are persuaded by the Sixth Circuit's analysis in *Akins v. Easterling*, 648 F.3d 380, 389–92 (2011), which reviewed a *Batson* challenge resolved by the Tennessee Court of Criminal Appeals in August 2000 under the same standard used

11

by the Kansas Supreme Court. The Sixth Circuit said that courts "overwhelmingly reject a sole-motivation standard in favor of some level of dual-motivation analysis." *Id.* at 391. It noted that some courts apply a mixed-motive standard, which bars a discriminatory motivation that is a but-for cause for the peremptory strike, while others apply "a per se approach under which any improper discriminatory motivation violates *Batson*." *Id.* at 389. Nevertheless, the circuit court could not "conclude that the state court's application of a sole-motivation standard, rather than a per se approach or mixed-motive standard, is an unreasonable application of the relevant clearly established Supreme Court law." *Id.* at 392. The court pointed out that "the Supreme Court used the word 'solely' in the *Batson* decision itself: 'the Equal Protection Clause forbids the prosecutor to challenge potential jurors *solely* on account of their race.'" *Id.* at 392 (quoting *Batson*, 476 U.S. at 89) (emphasis added). It then quoted from three subsequent Supreme Court opinions in 1991, 1994, and 2000 that repeated the "solely" phrasing, and it noted that lower federal courts had continued to use that language. *See id.* As *Akins* reasoned, "The Supreme Court in *Batson* and its progeny, and the lower federal courts in applying *Batson*, may not have intended the inclusion of 'solely' to preclude dual-motivation analysis in appropriate cases, but it nonetheless informs our analysis of the reasonableness of the state court's decision." *Id.* (citation omitted).

No Supreme Court decision from the time of the Tennessee Court of Appeals decision in *Akins* (August 2000) until the Kansas Supreme Court decision in *Washington* (May 2003) would change the analysis. The Supreme Court cited *Batson* only once during that period—in *Miller-El v. Cockrell*, 537 U.S. 322 (Feb. 2003). But that opinion

12

did not say anything about mixed motives nor did it purport to expand, limit, modify, or even clarify *Batson* doctrine.  The point of the opinion was that circuit courts should more readily grant certificates of appealability.  It illustrated the point by showing the colorable merit of the *Batson* claim in that case.  To be sure, the Court emphasized the centrality of determining the prosecutor's credibility, but in doing so it was reiterating what it had said in prior opinions.  *Compare id.* at 339 ("[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible."), *with Batson*, 476 U.S. at 98 n.21 ("[T]he trial judge's findings in the context under consideration here largely will turn on evaluation of credibility.").  We conclude that the Kansas Supreme Court did not adopt an unreasonable view of United States Supreme Court precedent by using a sole-motivation standard to assess *Batson* claims in 2003.

Mr. Washington has two remaining arguments that the Kansas courts misapplied even that standard.  First, he argues that they ended their analysis at the second step of the *Batson* framework—determining that the prosecutor provided a race-neutral justification for the peremptory strike—and did not proceed to the third step—determining whether purposeful discrimination occurred.  Under the Kansas reading of *Batson*, this third step amounts to a determination that the justification stated by the prosecutor was a sincere one, not a pretext for racial discrimination.  The argument has some merit but cannot carry the day.

There is language in the Kansas Supreme Court's opinion that suggests it stopped at the second step.  On several occasions the opinion concludes its rejection of a challenge to a strike by stating that the prosecutor gave a "facially valid, race-neutral reason."  *Washington*, 68 P.3d at 145, 146, 147.  One could read this language as

13

indicating that the court was not concerned with whether the stated reason was pretextual, a concern required by *Batson*'s third step.

But our Supreme Court has repeatedly counseled that on review under AEDPA we must construe reasonably what the state court decided. We cannot take language out of context to slap the hand of the state court. For example, in *Holland v. Jackson*, 542 U.S. 649 (2004) (per curiam), the circuit court had held that the state court acted contrary to clearly established federal law regarding ineffective-assistance-of-counsel claims by requiring prejudice to be shown by a preponderance of the evidence rather than just a reasonable probability. *See id.* at 654. The lower court had focused on several statements by the state court, such as, "[i]n a post-conviction proceeding, the defendant has the burden of proving his allegations by a preponderance of the evidence." *Id.* (internal quotation marks omitted). The Supreme Court explained, however, that even though the state court's language could be read as the circuit court interpreted it, "[i]n context . . . this statement is reasonably read as addressing the general burden of proof in postconviction proceedings with regard to factual contentions." *Id.* The Court's guiding principle was that "state-court decisions [should] be given the benefit of the doubt" and "[r]eadiness to attribute error is inconsistent with the presumption that state courts know and follow the law." *Id.* at 655 (internal quotation marks omitted); *accord Woodford v. Visciotti*, 537 U.S. 19, 23–24 (2002) (state court's use of word *probable* rather than the correct term *reasonably probable* did not justify circuit court in overturning state-court decision; state court was just using imprecise shorthand). As the Eleventh Circuit has nicely expressed the point, "[O]veremphasis on the language of a state court's rationale

14

would lead to a grading papers approach that is outmoded in the post–AEDPA era."

*Ferguson v. Sec'y, Florida Dep't of Corrections*, 716 F.3d 1315, 1337 (11th Cir. 2013) (internal quotation marks omitted).

Perhaps the Kansas Supreme Court's language would not earn a high grade. But when we carefully consider what it, and the trial court, did, we cannot say that they failed to consider the sincerity—the credibility—of the prosecutor's proffered reasons for her peremptory strikes. If the state supreme court had accepted the prosecutor's proffered reasons at face value, it could have disposed of the *Batson* challenge to each juror in one or two sentences. Instead, it devoted several paragraphs to each, determining whether there was a factual basis for the reason and whether the reason was sensible. The trial court took the same approach. For example, when defense counsel contested the striking of Ms. Powers (the 18-year-old member of the jury venire), arguing that she was an eligible voter and in fact had life experiences, the court responded:

> *Court:* I understand, but there was a request to have her struck for cause because of tests she was on. I don't think she is struck because of her race. If she is 18, she is a young juror and it may be the state doesn't want her on there. But I don't think it's race related.
> *Defense counsel:* It's race related when you take it all into consideration that all ten of the twelve strikes are black.
> *Court:* I understand that. I'm going to deny your objection to the jury.

Tr. of Jury Voir Dire at 229.

There remains the final component of Mr. Washington's *Batson* challenge. He argues that the Kansas Supreme Court unreasonably determined facts in upholding the peremptory strikes. In particular, he contends that the record cannot support striking Ms. Spratt and Ms. Hodges for the prosecutor's stated reason that in discussing their prior

15

jury experience they were "'quite evasive on what kind of case that was and the fact they seemed to have a hard time remembering or understanding the concept of what that case was about.'" Pet'rs Suppl. Br. at 12 (quoting voir dire transcript at 224). Mr. Washington asserts that "Ms. Spratt was immediately responsive" and that Ms. Hodges "answered the questions directly, without hesitation, and with no evidence of bad memory or confusion." *Id.* That assertion reads too much into the transcript of the voir dire. Transcripts do not reveal facial expressions, tone of voice, or body language. Nor do they reflect how long it took a witness to respond or how often the witness paused during the response. Those who attend trials and then read the transcripts are commonly astonished by how much a perfect transcript can distort reality. We must defer to the judge who was present when the prospective jurors were questioned. As the Supreme Court has said:

> [T]he trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province.

*Snyder*, 552 U.S. at 477 (internal quotation marks omitted); *see Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) ("[A] trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to great deference." (internal quotation marks omitted)); *Hernandez v. New York*, 500 U.S. 352, 365 (1991) ("Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding 'largely will turn on evaluation of credibility.'" (quoting *Batson*, 476 U.S. at 98 n.21)).

16

In this case the judge credited the descriptions by the prosecutor of the jurors' responses, and defense counsel apparently did as well. The judge was familiar with the questioning of the jurors stricken by the prosecutor, responding to the prosecutor's explanations as follows: "Obviously, in regard to Ms. Blake and Mr. Collins, Mr. Brantley, Mr. Fielder and Ms. Powers, I'm not surprised by those strikes. As to 1, 13, 18 and 19, those are individuals who didn't—well, Ms. Spratt did answer some questions. The others were based on the jury questionnaires." Transcript at 228. When defense counsel protested about the strike of Ms. Spratt, saying, "[S]triking somebody because they live in the projects—," *id*., the prosecutor responded, "That was one reason, Judge. The other reason was her response—," *id.* at 229. The judge interrupted to agree with the prosecutor that the other reason was valid and started to agree with defense counsel that the "projects" reason was not: "She indicated two reasons. One was as to the prior jury duty. I agree with you, Mr. Coggs [defense counsel]. I don't—." *Id.* But defense counsel, apparently conceding defeat (without challenging in any way the validity of the "other" reason), interrupted the judge to begin arguing about another juror: "Well, Ms. Powers was asked her age. She is 18. She is an eligible voter. She has life experiences." *Id*.

In light of the trial judge's rulings, based on an obvious familiarity with the jurors' responses, and the absence of any challenge on that score by defense counsel at trial, we cannot agree that the Kansas Supreme Court unreasonably determined facts.

## IV.    *MIRANDA* CLAIMS

Mr. Washington argues that his confession should have been suppressed under *Miranda v. Arizona*, 384 U.S. 436 (1966), because he was not given *Miranda* warnings at the outset of his interview at the police station.  *Miranda* warnings are required only when the person questioned "has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977) (internal quotation marks omitted) (warning not required before questioning in police office after suspect was told of police suspicions but voluntarily went to the office).  Mr. Washington claims that he was under arrest and in custody when interviewed.  But the Kansas Supreme Court reasonably rejected that argument on direct appeal.  We summarize the relevant evidence from the Kansas court's opinion, 68 P.3d at 140–42, 148–51:

About 1:30 a.m. on January 16, 2000, officers responding to a report of gunshots and a woman's cry for help found Ms. Quinn's body on a lawn.  Soon thereafter they found a Chevrolet Cavalier with a warm engine parked nearby.  The car was registered to Nina Betts.  There was no indication that the car had been stolen.  Two detectives went to her apartment shortly after 8:30 a.m.  Mr. Washington answered the door when they knocked.  Ms. Betts said that her car had still been parked outside at 11 p.m. the night before.  She also said that Mr. Washington had been at her apartment the entire evening.

Wanting to question Mr. Washington separately from Ms. Betts, the detectives asked him to go to the detective's bureau.  He said, "[S]ure, no problem."  After he left with a detective, Ms. Betts agreed to a search of her apartment.  The search, which took

18

about two hours, uncovered bullets and a handgun.  It is unclear when Ms. Betts was driven to the detective's bureau but she was not interviewed until 11:10 a.m., after the search.  During that interview Mr. Washington waited in a "victim's room" with a television.

Questioning of Mr. Washington began about 12:30 p.m. and continued to 1:20 p.m.  After the detectives told Mr. Washington about inconsistencies between the evidence and Ms. Betts's statement, they told him that he did not have to talk with them but they would like to know what happened.  Mr. Washington asked, "[A]re you guys going to listen to me?" and "began crying uncontrollably."  *Id.* at 150 (internal quotation marks omitted).  Once the detectives were able to calm Mr. Washington down, they read him his *Miranda* warnings and he waived his rights before confessing to the murder.

In denying Mr. Washington's *Miranda* claim, the Kansas Supreme Court pointed out that he agreed to go to the detective's bureau, was not in an interrogation room but a victim's room with a television set, was not advised of any outstanding warrants against him, was not formally arrested or handcuffed, was asked to come to the bureau before detectives knew who he was or suspected him of a crime, and would not have been forced to go to the station if he had declined the invitation.  *See id.* at 150–51.  Although Mr. Washington was at the bureau for four hours before being interviewed, the court said that "most of that time was accounted for based upon the delay faced by the detectives in searching Betts' apartment."  *Id.* at 150.  On this record the Kansas Supreme Court determined that the trial court's decision that Mr. Washington was not under arrest or in custody before he was given *Miranda* warnings was supported by "substantial competent

19

evidence" and correctly applied the law. *Id.* at 151. Mr. Washington has not cited, nor are we aware of, any Supreme Court decision that would compel, or even suggest, a contrary ruling. He is not entitled to relief under § 2254 on this claim.

## V.    INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Washington argues that his trial counsel was ineffective for not calling him as a witness at the *Miranda* suppression hearing to testify to his version of the facts surrounding his questioning by the detectives. Under his version the question whether he was in custody when he was first interrogated is significantly more difficult to answer. There is a reasonable argument that if his attorney was aware of that version, the attorney should have called him as a witness to support a *Miranda* claim. But to establish a claim of ineffective assistance of counsel, the defendant must show not only that counsel's performance was deficient but that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694 (1984). Mr. Washington failed to show the requisite prejudice.

After his conviction but before his appeal, Mr. Washington, through a new attorney, filed a motion for a new trial based on the alleged failure of original trial counsel to represent him adequately at the pretrial motion to suppress. At the evidentiary hearing on the motion, Mr. Washington testified to his version of what happened. But the trial judge found the testimony self-serving and not credible, so it would have denied the motion to suppress in any event. The Kansas Supreme Court reasonably affirmed the

20

denial of the ineffectiveness claim on that ground. *See Washington*, 68 P.3d at 152–53. We reject the claim.

## VI. PROSECUTORIAL MISCONDUCT

Mr. Washington's final claim concerns the prosecutor's closing argument at trial. Mr. Washington put on a defense based on his suffering from posttraumatic stress disorder (PTSD). He testified that at the time of the shooting he was deathly afraid of a man named Hill, who had made attempts on his life. He said that on the night in question he believed Ms. Quinn was involved with Hill in a plot on his life and that he shot Ms. Quinn in self-defense, not intending to kill her and not possessing the mental state necessary to commit premeditated murder. Psychiatric testimony supported this defense. A Kansas statute provided that a defendant was not accountable for his actions if, "'as a result of mental disease or defect, [he] lacked the mental state required as an element of the offense charged.'" *Id.* at 155 (quoting Kan. Stat. Ann. § 22-3220).

During her closing argument the prosecutor argued that PTSD "does not give someone a license to kill." *Id.* at 154. The judge sustained Mr. Washington's objection to the argument and admonished the jury to disregard it. When the prosecutor resumed her argument, she stated that Mr. Washington's attorney "wants the jury to find that [PTSD] excuses [Mr. Washington's] conduct." *Id.* (internal quotation marks omitted). Mr. Washington objected again, but this time the judge overruled his objection.

The Kansas high court held that any error in the prosecutor's first statement was cured by the trial court's admonition to the jury, and it said that the second comment was not prejudicial because the trial court clearly instructed the jury on the defense and the

21

comment was not so inflammatory as to prejudice the jury against Mr. Washington. Again, we are aware of no Supreme Court decision that requires a contrary conclusion. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." (internal quotation marks omitted)).  Mr. Washington's claim has no merit.

## VII.   CONCLUSION

We AFFIRM the district court's denial of Mr. Washington's § 2254 application.