FILED
United States Court of Appeals
Tenth Circuit

September 25, 2019

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DALE GOLDEN,

    Defendant - Appellant.

No. 18-6163
(D.C. No. 5:17-CR-00203-F-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **BALDOCK** and **HARTZ**, Circuit Judges.
_____

Defendant Dale Golden was convicted of possessing contraband in prison.

_See_ 18 U.S.C. § 1791(a)(2) and (b)(3).  On appeal Defendant argues that (1) the

evidence of his guilt was insufficient, and (2) the government's peremptory challenge

to an African-American prospective juror violated _Batson v. Kentucky_, 476 U.S. 79

(1986).  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Defendant's

conviction.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument.  _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. BACKGROUND

Defendant was an inmate at Federal Correctional Institute (FCI) El Reno, a medium-security facility in El Reno, Oklahoma. Unique Corporation (UNICOR) employs inmates at the prison and teaches them job skills. Defendant worked as a welder for UNICOR's welding shop, which employed 60 to 80 inmates making metal products for the federal government.

The chief witness for the prosecution at trial was Ted Carey, the UNICOR general foreman at the facility. In the morning of July 6, 2017, Carey responded to a call from the detail foreman at the welding shop to bring him a replacement battery for his radio. After delivering the battery, Carey walked through the welding shop and noticed a person working behind a flash screen (which, among other things, protects those passing by from getting flash burns to their eyes while welding is underway) that had been moved to conceal what he was working on. Because Carey could not see who was behind the flash screen, he left the workshop and walked around the building to look through a window for a better view. Standing approximately two feet from Defendant, Carey observed him sitting on the edge of a bench leaning forward and grinding on a piece of metal. Carey could tell that the object being worked on was metal because sparks flew from it. Suspecting that Defendant was making a weapon, Carey pounded on the window, yelled Defendant's name, and instructed him to stand up and step toward the window. As Defendant stood up, Carey heard metal objects hit the cement floor. Defendant was blocked off

from the rest of the work bay by the flash screen and no other inmate was within 10 feet of him.

Carey ordered Defendant to come outside to where Carey was standing. Carey maintained clear and constant view of where Defendant had been working. Once Defendant was outside, Carey went inside to retrieve the items that Defendant had discarded. It took four to five seconds for Carey to move from his position outside to where Defendant had been sitting inside the welding shop. Carey discovered two sharp metal "shanks" underneath the bench where Defendant had been sitting. When he picked up the shanks the metal was still hot from the grinding. There were no other metal objects on the floor near Defendant's work bench that could have caused the sparks that Carey saw or could have made the sound that he heard when Defendant stood up. Upon discovering the shanks, Carey ordered Defendant to remove his welding gear and escorted him out of the work area. Because Carey "knew what I'd seen, and Inmate Golden was fabricating these shanks," he did not question any other inmates about the incident. R., Vol. III at 213.

Defendant's account at trial was rather different. On the morning in question, he was working on a set of dumbbells. Several other inmates were working in the work bay, including two inmates who were working three to five feet away from him. When he noticed Carey at the window, he slid the dumbbell toward a shelf under the window. The only thing that could have caused the sound that Carey allegedly heard was an air sander that he may have dropped. It took Carey at least a minute to a minute and a half to walk from outside the building into the work bay. When Carey

3

arrived in the bay, Defendant told him that the objects were not his and he pointed out that there were three prisoners present.

A jury found Defendant guilty of possessing contraband in prison, and he was sentenced to 33 months' imprisonment to be served consecutively to any undischarged term of imprisonment stemming from his previous conviction.

## II.    Sufficiency of Evidence

We review de novo a challenge to the sufficiency of the evidence. *See United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008). We consider "whether a reasonable jury could find a defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government and drawing reasonable inferences therefrom." *Id.* "We do not weigh the evidence or consider the credibility of witnesses." *United States v. Porter*, 928 F.3d 947, 955 (10th Cir. 2019).

Section 1791(a)(2) of title 18 penalizes "an inmate of a prison" who "makes, possesses, or obtains, or attempts to make or obtain, a prohibited object." 18 U.S.C. § 1791(a)(2). Defendant does not contest that he was an inmate or that the shanks were prohibited objects. His claim on appeal is that the government failed to provide sufficient evidence to prove that he knowingly possessed the shanks. He emphasizes that Carey did not see the shanks in his possession and that he failed to question or investigate the other inmates present in the workshop when the shanks were discovered. Aplt. Br. at 12.

We are not persuaded. The credibility of Carey was for the jury to decide. *See United States v. Renteria*, 720 F.3d 1245, 1254 (10th Cir. 2013). And

4

"possession [of an object] may be proved by circumstantial as well as direct evidence." *United States v. Morales*, 758 F.3d 1232, 1235 (10th Cir. 2014) (original brackets and internal quotation marks omitted). If the jury believed Carey, Defendant's knowing possession of the shanks was a natural inference.

### III. *Batson* Claim

Defendant also raises a claim under *Batson*. That decision established "that the Equal Protection Clause of the Fourteenth Amendment forbids the purposeful exclusion of a potential juror on account of race." *Washington v. Roberts*, 846 F.3d 1283, 1287 (10th Cir. 2017). The Supreme Court set forth a three-step burden-shifting framework to assess whether a peremptory challenge to a prospective juror was permissible. First, the defendant must establish a prima facie case "by presenting evidence supporting an inference that the prosecutor exercised the peremptory challenge to exclude a potential juror on the basis of race." *Id.* Second, "[i]f the defendant makes this showing, the burden shifts to the prosecution to provide a race-neutral justification for the strike." *Id.* "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (internal quotation marks omitted). Third, if the government succeeds at step two, "the court must determine whether purposeful discrimination occurred." *Washington*, 846 F.3d at 1287. This determination is a question of fact subject to deferential review under the clear-error standard. *See Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) ("On appeal, a trial

5

court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous").

Defendant, an African-American man, challenges the district court's denial of his objection to the prosecutor's use of a peremptory challenge to excuse Juror 23, an African-American woman. There were 28 prospective jurors, only two of whom were African-American. The prosecution exercised five peremptory challenges, four against Caucasian members of the jury, and the fifth against Juror 23. It waived its sixth available challenge. After the prosecutor announced his intent to strike Juror 23, defense counsel asked him to proffer a reason for excusing her.

Before requiring the prosecutor to state his basis for the challenge, the court set forth the *Batson* standard. The prosecutor then asserted that Defendant had failed to establish a prima facie case of discrimination; but he nevertheless stated that his reason for striking Juror 23 was her "current study of victim -- her study at [Oklahoma State University], the Oklahoma City branch, for victims of crime." R., Vol. III at 111.[1] Defense counsel asserted that the proffered reason for the strike did not suggest that Juror 23 would be predisposed in favor of Defendant and therefore was insufficient.

The district court denied the *Batson* challenge, reasoning that Juror 23's work with victims of crime was a permissible race-neutral basis for the strike. The court

---

[1] During voir dire, Juror 23 stated that she was "a current student at OSU/OKC for crime victim survivors, survivor services, and alcohol and substance abuse counseling." R., Vol. III at 70.

said that because of her work "and for reasons unrelated to her race," the juror was "exceptionally likely to have a pro-victim orientation." R., Vol. III at 112. It continued:

> If an individual has a pro-victim orientation, then it is no leap at all to strongly suspect that that very same individual will tend to have some degree of bias against individuals who have transgressed the law sufficiently to find themselves incarcerated in a federal correctional institution.
>
> And for that reason – I'm not critical of the defendant certainly for raising the issue, but for that reason, the Batson challenge is denied.

*Id*.

During trial the district court clarified its *Batson* ruling, noting that there were race-neutral reasons upon which either side could have justified a peremptory challenge. The court said:

> It's kind of an interesting situation because, in my view, there were actually race-neutral reasons for which either side could have justified a strike of this prospective juror . . . .
>
> And in my ruling I articulated a reason for which the defendant might just as easily have exercised a peremptory challenge to excuse [Juror 23].
>
> Her employment in the behavioral health field, together with her studies in the field of substance abuse counseling, could give the government cause for concern that she would have a tendency to bend over backwards to give the defendant the benefit of the doubt.
>
> The defendant, on the other hand, could have cause for concern because the defendant could certainly infer from sympathy for crime victims, which is the subject of her studies at OSU-OKC, an antipathy toward the convicted criminals whose activities result in individuals being crime victims in the first place.
>
> The government specifically mentioned her studies at OSU-OKC with respect to crime victims. From the government's perspective, that could amount to an invitation to the defendant to make himself out, for the benefit

7

of this juror, to be a crime victim within the institution, which could be problematic for the government given the nature of the charge in this case.

Also in the mix is the fact that there were no similarly situated white jurors who were not stricken.

R., Vol. III at 183-84.

The court then proceeded to rule on the three steps of the *Batson* framework. First, it said that Defendant "did not make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." R., Vol. III at 184. Second, assuming that Defendant had established a prima facie case, it said that "the government did offer a neutral explanation." *Id*. The court noted that "[a]lthough a comprehensible reason must be presented, the second step of this process does not require an explanation that is persuasive or even plausible," and that "[t]he explanation is sufficient as long as the reason is not inherently discriminatory." R., Vol. III at 184.[2] Finally, the court asserted that Defendant "did not carry his burden of persuasion" on improper motivation. *Id*. at 185.

Defendant's arguments on appeal focus entirely on the prosecutor's explanation for the strike. He contends that the explanation was so poor that the true

---

[2] We have said that "the first issue of whether a prima facie case of discrimination exists becomes moot whenever the prosecutor offers a race-neutral explanation for his peremptory challenges and the trial court rules on the ultimate factual issue of whether the prosecutor intentionally discriminated." *United States v. Barrett*, 496 F.3d 1079, 1104 (10th Cir. 2007) (internal quotation marks omitted). Hence, we need not address whether Defendant established a prima facie case for discrimination. But the evidence concerning the prima facie case is still relevant to determining whether a peremptory strike was discriminatory.

reason must have been discriminatory. He acknowledges that "[t]he Government's proffered reason, on its face, was not based on racial motive." Aplt. Br. at 15. But he contends that because her studies (the reason given for the strike) would actually "predispose her *in favor* of the Government," *id*., the reason must have been pretextual.

We are not persuaded. At the second step of *Batson* the proffered reason for a peremptory challenge need not be "minimally persuasive" or even "plausible." *Purkett*, 514 U.S. at 768 (internal quotation marks omitted). "It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id*. And even at the third step of the inquiry, the assessment is one of credibility; the trial judge may credit the sincerity (if not the wisdom ) of a silly or superstitious reason.

The district court found that Juror 23's work with victims of crime served as a satisfactory race-neutral reason for a peremptory challenge. The court stated "that [her studies] could amount to an invitation to the defendant to make himself out, for the benefit of this juror, to be a crime victim within the institution, which could be problematic for the government given the nature of the charge in this case." R., Vol. III at 183–84. It is not unusual for prosecutors to be skeptical of potential jurors who have shown unusual sympathy for those who have had troubled lives. *See United States v. Sneed*, 34 F.3d 1570, 1579 (10th Cir. 1994) (upholding a prosecutor's peremptory challenge against the only Asian-American juror on a panel

9

because he felt that, among other things, "she would be more sympathetic towards the defense because she worked in the counseling field"); *United States v. Alvarado*, 951 F.2d 22, 24 (2nd Cir. 1991) (social worker); *United States v. De La Rosa*, 911 F.2d 985, 990-91 (5th Cir. 1990) (affirming a prosecutor's challenge of the only Hispanic member of a jury because of "her employment with a church-affiliated agency," stating that the juror "would be inclined to side with the defendant because someone who works in a church ministry basically wants to forgive people" (ellipsis and internal quotation marks omitted)); *cf. United States v. Nelson*, 450 F.3d 1201, 1206, 1208 (10th Cir. 2006) (finding no racially discriminatory intent when a prosecutor struck a black male college professor because the prosecutor believed that college professors "think [they] know a lot" and are "typically very opinionated" (internal quotation marks omitted)).

We hold that the district court did not commit error under *Batson*.

## IV.   CONCLUSION

We AFFIRM.

Entered for the Court

Harris L Hartz
Circuit Judge

10